IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X

UNITED STATES OF AMERICA,

                    Plaintiff,                    Criminal Action No. 06-76 (GMS)

      v.

CHIAN SPIRIT MARITIME ENTERPRISES, INC.,
VENETICO MARINE S.A., *et. al.*

                    Defendants.

-------------------------------------------------------X

**DEFENDANTS, CHIAN SPIRIT MARITIME ENTERPRISES, INC.
AND VENETICO MARINE, S.A.'s, MOTION:**

**(1) TO DISMISS COUNT 2 OF THE INDICTMENT, OR IN THE
ALTERNATIVE, FOR A BILL OF PARTICULARS;**

**(2) FOR A BILL OF PARTICULARS AS TO COUNTS 1, 3-5 OF
THE INDICTMENT; AND**

**(3) TO EXCLUDE ANY EVIDENCE OR ALLEGATIONS OF
DISCHARGES OF OILY SLUDGE OR BILGE WASTES
<u>OCCURING OUTSIDE OF U.S. WATERS.</u>**

Defendants, *Chian Spirit Maritime Enterprises, Inc.* ("CSME") and *Venetico Marine, SA* ("Venetico")(collectively "defendants" or "moving defendants"), by and through undersigned counsel, respectfully move this Honorable Court to (1) dismiss Count 2 of the Indictment, or in the alternative for a Bill of Particulars; (2) for a Bill of Particulars as to Counts 1, 3-5 of the Indictment; and (3) to exclude the introduction of any evidence or allegations of discharges of oily sludge or bilge wastes occurring outside of U.S. waters.

## PROCEDURAL HISTORY

On or about July 13, 2006, the United States sought and obtained a five (5) count Indictment as against, *inter alia*, the above named moving defendants. In Count 2, the Government alleged, in sum and substance, that the moving defendants failed to maintain an accurate oil record book (hereinafter "ORB").

Specifically, Count 2 of the Indictment provides, in pertinent part, as follows:

\* \* \*

*31. On or about December 5, 2005, in the District of Delaware, the defendants, CHIAN SPIRIT MARITIME ENTERPRISES, INC., VENETICO MARINE S/A . . . did knowingly fail to maintain an Oil Record Book for the Irene in which all unprocessed overboard discharges of oily sludge and bilge wastes from the Irene were required to be fully recorded.*

*32. All in violation of Title 33, United States Code, Section 1908(a), Title 18, United States Code, Section 2, and Title 33, Code of Federal Regulations, Section 151.25.[1]*

Following the issuance of the Indictment, seven (7) depositions of vessel crewmembers and engineering personnel were taken, pursuant to F.R.Crim.P 15, at the offices of the United States Attorney for the District of Delaware during the period of July 14, 2006 through July 21, 2006.[2]

---

[1] *See* Indictment, at paragraphs 30-32

[2] Thereafter, on or about September 7, 2006, a preliminary conference was held before the Court, at which time, the following schedule was ordered: October 13: Pre-trial Motions, if any, to be exchanged; October 20: Motions in Opposition, if any, to be filed; October 27: Motions Hearing (10:00 am before Judge Sleet); November 21: Final Pretrial Conference (Telephonic Conference)(2:00 pm); (a joint submission regarding proposed jury instructions; proposed verdict sheet; objections to the deposition testimony and all other pre-trial matters are to be addressed on or before the November 21, 2006 final pre-trial conference); and December 18: Trial (Jury Trial Estimated to last 5 days). In accordance with the above noted schedule, it is respectfully submitted that moving defendants have filed and served this motion in a timely fashion.

## APPLICABLE LAW AND REGULATION

There can be no dispute that the MARPOL Protocol, an international treaty[3], implemented and codified in the United States by the Act to Prevent Pollution from Ships[4] (hereinafter "APPS"), is applicable to the M/V IRENE E.M. *only* when *operating in the United States waters or while at a port or terminal in the jurisdiction of the United States.*[5] It is also undisputed that APPS authorizes the U.S. Coast Guard to issue regulations implementing various requirements contained within the MARPOL treaty[6]. The Coast Guard, indeed, has issued such regulations at 33 C.F.R 151.01, *et. seq.*[7]

Similarly, there is no dispute that the U.S. Coast Guard has the authority to board and examine the ORB of any vessel *while that vessel is in U.S. waters or at a U.S. port.*[8] Specifically, a "Port State[9]," (such as the U.S. with respect to the M/V IRENE E.M.'s call at Delaware on or about December 5, 2005), is permitted to conduct inspections to ensure compliance *in their ports and waters.*[10]

Generally, the discovery of a suspected failure of a vessel to comply with the above noted statutory and regulatory requirements entitles the United States to do one (1) of four (4) things:

---

[3] The International Convention for the Prevention of Pollution from Ships, 1973, as modified by the Protocol of 1978, sets forth the international standards for, among other things, the standards for bilge water movement and discharges from ocean going vessels. Together, these two (2) treaties are generally referred to as MARPOL 73/78 or MARPOL.

[4] *See* 33 USC Sect. 1901, et. seq..

[5] *See* 33 C.F.R. 151.09; *See also* Indictment, at para. 7.

[6] *See* 34 USC 1903 & 1907.

[7] *See* 33 C.F.R. 151.01, *et. seq.*

[8] *See* 33 USC 1904(c); 33 C.F.R. 151.23(a)(3) and (c).

[9] Ships, such as the M/V IRENE E.M. sail under the flag of one State only (i.e.-the "Flag State" of St. Vincent & the Grenadines), and are subject to its exclusive jurisdiction when on the high seas. United States v. Vilches-Navarrette, 413 F.Supp.2d 60,70 (D.P.R. January 27, 2006). *See also* United States v. Abrogar, 459 F.3d 430 (3d Cir. 2006), wherein the Court stated that the country in which a ship is registered is known as the "flag state". When a vessel enters the territorial waters or port of a country, that nation is referred to as the "port state". In Abrogar, the vessel was calling at a port in the United States, thus the United States was the "port state".

[10] *See* United States v. Abrogar, *supra.*

(1) refuse to allow that ship to enter port;

 (2) to prohibit the ship from leaving port without remedial action;

(3) to refer the matter to the flag state of the vessel; or

(4) prosecute the violation in the U.S.

For the reasons more fully set forth below, it is beyond dispute that the United

States is **_not_** authorized to prosecute and/or punish any suspected violations occurring

*outside* United States territory on a foreign-flagged vessel such as the M/V IRENE E.M.


## JURISDICTIONAL LIMITATIONS

It has long been held that the United States' jurisdiction over offenses is generally

limited to the territory of the United States, its flagged vessels and/or conduct by its

citizens. *See* United States v. Smiley, 27 F.Cas. 1132 (CCND Cal 1864): Ito v. United

States, 64 F.2d 73 (9th Cir. 1933), cert. denied, 289 U.S. 762, 53 S.Ct. 796, 77 L.Ed. 1505

(1933).  In fact, there must be a clear intent by Congress to impose punishment for extra-

territorial conduct. *Id.*  Absent any such indication, as is the case here, the courts of the

United States do not have jurisdiction to try an offense that occurs outside United States

territory on a vessel registered in a foreign State.  *See* United States v. Assia, 118 F.915

(CCED N.Y. 1902).

As a general principle, it is clear that APPS requires any suspected violations of

the MARPOL treaty (a) by a foreign-flagged vessel (b) outside of U.S. waters, to be

referred to the vessel's Flag State for further action.

Specifically in this regard, the USDC-S.D. Fl. has held:

*The MARPOL Protocol, more formally known as the Protocol of*
*1978 Relating to the International Convention for the Prevention*

4

*of Pollution from Ships, 1973, is a treaty to which the United States is a party; its provisions are codified as U.S. law as APPS, the Act to Prevent Pollution from Ships, at 33 U.S.C. § 1901 et seq. MARPOL establishes a framework for addressing discharges of pollutants on the high seas. Among the requirements, under MARPOL is that ships must maintain an Oil Record Book in which entries of activities relating to oil discharges are to be entered. (Regulation 20 of Annex 1 of MARPOL). ... For jurisdictional purposes, the requirements concerning the Oil Record Book apply to a ship that operates under the authority of a country other than the United States. . ., while the ship is "in the navigable waters of the United States, or while at port or terminal under the jurisdiction of the United States." 33 C.F.R. § 151.09(a)(5). While MARPOL authorizes, inter alia, a port state to inspect a ship to verify a discharge in violation of MARPOL, it requires a port state finding a discharge violation contravening the Convention to forward the report to the Secretary for further action from the flag state. 33 U.S.C. § 1907(c)(2); MARPOL, Art. 6(2).*

See <u>United States v. Royal Caribbean Cruises, Ltd.</u>, 11 F. Supp. 2d 1358 (S.D. Fl 1998); 1998 U.S. Dist. LEXIS 7351; 1998 AMC 1817.

Here, the moving defendants are not charged with a substantive MARPOL violation. Rather, moving defendants are specifically charged [in Count 2] with a violation of APPS Section 1908(a) for an alleged knowing failure to maintain an accurate ORB (while in U.S. waters). As per 33 U.S.C. 1902, Congress specifically chose to restrict the scope of Section 1908 to foreign ships, such as the M/V IRENE E.M., (1) "while' the ship is in the navigable waters of the United States, (2) "while" in the exclusive economic zone of the United States, and (3) "while" at a port or terminal in the United States.

Specifically, 33 U.S.C. 1902 provides, in pertinent part, as follows:

**Sec. 1902. Ships subject to preventive measures**

(a) Included vessels
This chapter shall apply -

5

(1) to a ship of United States registry or nationality, or one
operated under the authority of the United States, wherever
located;
(2) with respect to Annexes I and II to the Convention, to a
ship, other than a ship referred to in paragraph (1), while in
the navigable waters of the United States;
(3) with respect to the requirements of Annex V to the
Convention, to a ship, other than a ship referred to in
paragraph (1), while in the navigable waters or the
exclusive economic zone of the United States; and
(4) with respect to regulations prescribed under section
1905 of this title, any port or terminal in the United States.

Accordingly, it is clear that Congress deliberately chose to make 1908(a)'s

criminalization provisions applicable *only* to a foreign ship, such as the M/V IRENE

E.M., (1) "while' the ship is in the navigable waters of the United States; (2) "while" in

the exclusive economic zone of the United States, or (3) when at a port or terminal in the

United States.

Similarly, the Coast Guard regulations which give rise to the alleged violation

contain a substantially identical territorial limitation. Specifically, the Coast Guard

regulation upon which the Government relies (with respect to its allegations of moving

defendants knowing failure to maintain an ORB, as alleged in Count 2 of the Indictment)

is 33 C.F.R. 151.25.[11]  There can be no dispute that 33 C.F.R. 151.25 is also limited in its

applicability (to the same extent as the limitation imposed by 33 U.S.C. 1902(a)).

Specifically, 33 C.F.R. 151.09 provides, in pertinent part, as follows:

*[Sections] 151.09 through 151.25 apply to each ship that  --
[operated under the authority of the United States in four specified
circumstances] or; (5) is operated under the authority of a country
other than the United States **while in the navigable waters of the***

---

[11] *See* Indictment, at Paragraph 32.

> *United States, or while at a port or terminal under the*
> *jurisdiction of the United States."*(emphasis added).

Notwithstanding the foregoing and perhaps more importantly, in a matter

involving similar allegations and charges against a foreign flagged vessel and her

personnel, the Third Circuit Court of Appeals, in <u>United States v. Abrogar</u>, *supra[12]*,

recently provided a clear and precedential decision defining the substantive acts for

which Congress and the Coast Guard have created criminal liability under U.S. law.

Specifically, the Third Circuit has held:

> \* \* \*
>
> *In sum, Congress made 1908(a)'s criminalization of*
> *MARPOL violations applicable only to U.S. ships,*
> *wherever located, and foreign ships in three specific*
> *circumstances: (1) "while" the ship is within the*
> *navigable waters of the United States"; (2) "while" in the*
> *"exclusive economic zone of the United States"; and (3)*
> *when at a port or terminal in the United States.*
>
> \* \* \*
>
> *We conclude, therefore, that under the APPS and*
> *accompanying regulations, Congress and the Coast*
> *Guard created criminal liability for foreign vessels and*
> *personnel only for those substantive violations of*
> *MARPOL <u>that occur in U.S. ports or waters.</u>*
>
> \* \* \*
>
> *As discussed above, the <u>United States has no jurisdiction</u>*
> *<u>to prosecute a foreign vessel or its personnel for "failure</u>*
> *<u>to maintain an accurate oil record book" outside of U.S.</u>*
> *<u>waters.</u> Furthermore, no provision of the APPS or its*
> *accompanying regulations indicates that "failure to*
> *maintain an accurate oil record book" by a foreign ship*
> *outside U.S. waters is a crime. <u>Stated differently, the</u>*
> *<u>terms of the Act and its regulations exclude from criminal</u>*
> *<u>liability the failure to maintain an accurate oil record</u>*
> *<u>book" by foreign vessels outside U.S. waters.</u>*

---

[12] For the Court's ready reference and convenience, moving defendants append hereto as Exhibit "A" a copy of the Third Circuit's decision in <u>United States v. Abrogar.</u>

7

\* \* \*

> *... criminal liability for MARPOL violations by a foreign vessel does not attach until that vessel enters U.S. waters, the improper discharges at issue here – all of which occurred outside U.S. waters on this record – do not constitute "substantive environmental offense[s]" under U.S. law any more than the failure to maintain an accurate oil record book outside U.S. waters constitutes a record keeping offense under U.S. law.   (emphasis added).[13]*

## POINT I

### COUNT 2 OF THE INDICTMENT MUST BE DISMISSED, *AS A MATTER OF LAW,* AS IT FAILS TO ALLEGE THAT DEFENDANTS HAVE FAILED TO RECORD ANY "UNPROCESSED DISCHARGES OF OILY SLUDGE AND BILGE WASTES" IN U.S. WATERS.

### a.  *Count 2 of the Indictment fails to allege any criminal conduct under U.S. law.*

As stated above, the specific charges contained in Count 2 is that, *"On or about December 5, 2005, in the District of Delaware, the defendants, CHIAN SPIRIT MARITIME ENTERPRISES, INC., VENETICO MARINE S/A, . . . . did knowingly fail to maintain an Oil Record Book for the Irene in which all unprocessed overboard discharges of oily sludge and bilge wastes from the Irene were required to be fully recorded."*

In view of the above precedent and below argument, it is respectfully submitted that there is absolutely no legal requirement imposed by the United States for a foreign flagged vessel, such as the M/V IRENE E.M., to maintain an ORB at any time *except* while it is in the waters or the ports of the United States.  Perhaps more to the point, it is clear that it cannot be a crime under the laws of the United States for a foreign flagged

---

[13] *See* United States v. Abrogar, *supra.*

vessel (such as the M/V IRENE E.M.) to fail to maintain entries in an ORB with respect to alleged discharges occurring outside of U.S waters.

Rather, the Government can only charge and potentially punish, --as it has done and seeks to do here -- an alleged failure to maintain an accurate ORB "while" the foreign-flagged ship was in U.S. waters.  To that end, the Third Circuit has expressly held that: *the terms of the Act [APPS] and its regulations* ***exclude*** *from criminal liability the failure to maintain an accurate oil record book by foreign vessels outside U.S. waters.*[14]

Notwithstanding, Count 2 of the indictment fails to allege that any of the purported failure(s) [to record in the ORB "unprocessed overboard discharges of oily sludge and bilge wastes from the Irene"] occurred in U.S. waters.  Again, as noted by the Third Circuit, *APPS and its regulations expressly* ***exclude*** *from criminal liability the failure to maintain an accurate oil record book by foreign vessels outside U.S. waters.* Moreover, the Government has already obtained and preserved the trial testimony of all eyewitnesses it will call at trial, and is fully aware that there is absolutely no evidence to support any allegation(s) of such conduct occurring within U.S. waters.

Accordingly, in view of the failure of the Indictment to allege that any such record keeping failures occurred in U.S. waters, (and parenthetically, in view of the indisputable fact that absolutely no evidence exists to potentially support any allegation(s) of such conduct occurring within U.S. waters), it is respectfully submitted that Count 2 of the Indictment must be dismissed *as a matter of law.*

---

[14] *Id.*

### b. The U.S. Attorney's Own Manual Prescribes Dismissal of Count 2 of the Indictment.

Although concededly not precedential in nature, it is telling and instructive that

the U.S. Attorney's own manual prescribes dismissal of Count 2 of the Indictment.

Specifically, Section 9-27.220 of the U.S. Attorney's Manual provides, in pertinent part,

as follows:

> A. *The attorney for the government should commence or recommend Federal prosecution if he/she believes that the person's conduct constitutes a Federal offense <u>and that the admissible evidence will probably be sufficient to obtain and sustain a conviction</u>, unless, in his/her judgment, prosecution should be declined because:*
>   1. *No substantial Federal interest would be served by prosecution;*
>   2. *<u>The person is subject to effective prosecution in another jurisdiction;</u> or*
>   3. *<u>There exists an adequate non-criminal alternative to prosecution.</u>*

> \* \* \*

> *Merely because the attorney for the government believes that a person's conduct constitutes a Federal offense and that the admissible evidence will be sufficient to obtain and sustain a conviction, does not mean that he/she necessarily should initiate or recommend prosecution: USAM 9-27.220 notes <u>three situations in which the prosecutor may property decline to take action nonetheless: when no substantial Federal interest would be served by prosecution; when the person is subject to effective prosecution in another jurisdiction; and when there exists an adequate non-criminal alternative to prosecution.</u> (emphasis added).*

> \* \* \*

Here, it is clear that any failure to maintain an accurate ORB outside of U.S.

waters does not constitute a Federal offense. Similarly, as detailed above, the

Government's failure to allege (let alone obtain any admissible evidence during the Rule

15 depositions of the crew) that any such conduct occurred within U.S. waters, is

insufficient to obtain and sustain a conviction under APPS 1908(a) and/or its implementing regulations.

Additionally, assuming, *arguendo,* that any such conduct occurred outside of U.S. waters (a contention which is denied), it is clear that moving defendants would be subject to effective prosecution in another jurisdiction, -- namely, the Flag State of the vessel. It is beyond dispute that MARPOL provides that when one party to the convention learns of a suspected violation, it is to report the violation to the government of the Flag State (i.e. --the State under whose authority the ship is operating), which in turn shall investigate and prosecute any such violation.[15]  Indeed, MARPOL requires that the government of the State under whose authority the ship is operating is the proper body to prohibit **and** punish violations of MARPOL occurring on the high seas.[16]

In this regard, Congress has specifically empowered the appropriate government officials to refer any such violation that it suspects to the government of the country of the ship's registry or nationality for appropriate action.[17]  Said another way, any alleged discharges or failures to maintain an accurate oil record book on the high seas by foreign flagged vessels are required by MARPOL to be referred to the country of the ship's registry for action rather than to the nation which may uncover such a suspected violation. In fact, the entire enforcement protocol proscribed by MARPOL is fully consistent with Congress' express limitation of the scope of APPS Section 1908 to foreign-flagged vessels *only* while they are in the ports and waters of the United States.

---

[15] *See* MARPOL 1973, Article 6.
[16] *See* MARPOL 1973, Article 4.
[17] *See* 33 U.S.C. 1908(f).

Finally, there exists an adequate non-criminal alternative to prosecution under

U.S. law under 33 U.S.C 1908(b).[18]

For the reasons more fully set forth above, moving defendants respectfully

reiterate their request for an order to be entered dismissing Count 2 of the Indictment.

### POINT II

### ASSUMING, *ARGUENDO,* THAT COUNT 2 OF THE INDICTMENT IS NOT DISMISSED, IT FAILS TO ADEQUATELY ALLEGE THE FACTS AND CIRCUMSTANCES OF THE OFFENSE CHARGED AND A BILL OF PARTICULARS SHOULD BE ORDERED BY THE COURT.

Fed.R.Crim.P Rule 7(c) requires that an Indictment "must be a plain, concise and

definitive statement of the essential facts constituting the offense charged." This rule

reflects the Constitutional requirement of an indictment and the need to assure that the

defendant is tried on the factual theory upon which the grand jury indicted.  Fed. R.

Crim. P. 7(f) gives the Court discretion to direct the filing of a bill of particulars in that

regard. *See* United States v. Ramirez, 54 F. Supp.2d 25, 29 (D.D.C. 1999). Courts should

grant a motion for a bill of particulars when "'necessary to prevent unfair surprise at

trial'" and the Court must strike a "'prudent balance' between the legitimate interests of

the government and those of the defendants." *Id.* (citing United States v. Butler, 822 F.2d

---

[18] For the Court's ready reference, we note that 33 USC 1908(b) provides, in pertinent part, as follows:

(b) Civil penalties; separate violations; assessment notice; considerations affecting amount; payment for information leading to assessment of penalty
A person who is found by the Secretary, after notice and an opportunity for a hearing, to have--
(1) violated the MARPOL Protocol, Annex IV to the Antarctic Protocol, this chapter, or the regulations issued thereunder shall be liable to the United States for a civil penalty, not to exceed $25,000 for each violation; or
(2) made a false, fictitious, or fraudulent statement or representation in any matter in which a statement or representation is required to be made to the Secretary under the MARPOL Protocol, Annex IV to the Antarctic Protocol, this chapter, or the regulations thereunder, shall be liable to the United States for a civil penalty, not to exceed $5,000 for each statement or representation.

1191, 1192-93 (D.C. Cir. 1987) (additional citations omitted)). A bill of particulars "properly includes clarification of the indictment[.]" *See* <u>Ramirez</u>, 54 F.Supp. 2d at 30.

Count 2 of the Indictment fails to adequately allege, in a plain, concise, definitive manner, the essential facts constituting the offense charged, including, but not limited to the time, date and place of the alleged record keeping failures, as well as what, exactly, was purportedly inaccurately recorded in the ORB, *while* in U.S. waters and/or at a U.S. port. Accordingly, it is respectfully requested that Count 2 of the Indictment be dismissed.

Alternatively, if the Court concludes that the indictment is sufficient, moving defendants respectfully request a bill of particulars to address the factual issues mentioned above, including but not limited to identification of the time, date, and place of the alleged record keeping failures, as well as details as to what, exactly, was purportedly inaccurately recorded *while* in U.S. waters or at a U.S. port.

### POINT III

**BECAUSE COUNTS 1, 3-5 OF THE INDICTMENT FAIL TO
ADEQUATELY ALLEGE THE FACTS AND CIRCUMSTANCES
OF THE OFFENSES CHARGED, A BILL OF PARTICULARS
<u>SHOULD BE ORDERED BY THE COURT</u>**

Counts 1, 3-5 of the Indictment also fail to adequately allege, in a definitive manner, the essential facts constituting the offenses charged, including, but not limited to the time, date, and place of the alleged criminal conduct.

Specifically, moving defendants request that the Court direct the filing of a bill of particulars identifying the following information with respect to Count 1:

1. The basis for the allegation that the conspiracy began "on an unknown date, but including at least or about October 3, 2005, and continuing through on or about December 10, 2005 and the dates on which each alleged co-conspirator is alleged to have joined the conspiracy charged in the count. *See* Ramirez, 54 F.Supp. 2d at 30 (requiring disclosure of the approximate date on which each defendant joined the charged conspiracy).

2. All overt acts not already identified in the indictment (including dates of, locations of, and participants in meetings and conversations) allegedly committed in furtherance of the conspiratorial agreement alleged in Count 1. This information is necessary for moving defendants to prepare for trial and gain an understanding of the scope of the alleged conspiracy. If the Court is not inclined to grant this request in full, moving defendants ask that it be granted to the extent that they are alleged to have participated in the overt act. *See* Ramirez, 54 F. Supp. 2d at 30 (requiring disclosure of overt acts in which any defendant participated "so that each defendant may understand the government's view of his alleged role in the conspiracy").

3. The dates, times, and places at which moving defendants are alleged to have combined, conspired, confederated, and agreed with Messrs. Madias, Pagones, Dragomere and subordinate officers and engine department crew members of the M/V IRENE E.M., and "others known and unknown to the Grand Jury" to commit the violations alleged in Count 1.

4. The names of the unidentified persons "whose identities are known to the Grand Jury" whom the defendants allegedly conspired with. This information is

14

necessary to determine whether moving defendants knew these individuals and whether moving defendants had anything to do with them.

Similarly, as for Counts 3-5, moving defendants request that the Court direct the filing of a bill of particulars identifying the following information:

1. The dates, times, and places at which moving defendants are alleged to have "corruptly persuaded and attempted to corruptly persuade another person with the intent to influence the testimony of that person in an official proceeding."

2. The names and identity of all person(s) who are alleged to have acted on behalf of moving defendants, and are alleged to have "corruptly persuaded and attempted to corruptly persuade another person with the intent to influence the testimony of that person in an official proceeding." This information is necessary to determine whether moving defendants even dealt with or knew these individuals and whether moving defendants had anything to do with them.

3. The names and identity of all person(s) moving defendants, (and/or individuals alleged to have been acting on behalf of moving defendants) are alleged to have "corruptly persuaded and attempted to corruptly persuade another person with the intent to influence the testimony of that person in an official proceeding." This information is necessary to determine whether moving defendants even dealt with or knew these individuals and whether moving defendants had anything to do with them.

Accordingly, moving defendants respectfully request a bill of particulars to address the factual issues mentioned above, including but not limited to identification of the time, date and place of the criminal conduct, as alleged by the Grand Jury.

## POINT IV

### EVIDENCE AND/OR ALLEGATIONS OF DISCHARGES OF OILY SLUDGE OR BILGE WASTE OCCURRING OUTSIDE OF U.S. WATERS ARE *IRRELEVANT* TO THE SUBSTANTIVE CRIMES CHARGED AND PROPERLY TO BE EXCLUDED UNDER FRE 402

Irrespective of the Court's decisions with respect to the above noted applications, moving defendants further submit that evidence and/or allegations of discharges of oily sludge or bilge waste *outside* of U.S. waters and are (1) beyond U.S. Jurisdiction; (2) beyond the jurisdiction of this Honorable Court;  (3) beyond the scope of the charges presented in the Indictment; and (4) are otherwise *irrelevant* to the substances crimes charged, **and** are properly to be excluded under FRE 402.

It is axiomatic to state that *evidence which is not relevant is not admissible.* Specifically, FRE 402 provides the following:

> **Rule 402. Relevant Evidence Generally Admissible; Irrelevant Evidence Inadmissible**
>
> *All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.*

FRE 401 defines "relevant evidence" as follows:

> **Rule 401. Definition of "Relevant Evidence"**
>
> *"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.*

Here, the crimes charged are, ostensibly, (1) conspiracy (to knowingly fail to maintain an ORB)(Count 1 of the Indictment); (2) the knowing failure to maintain and ORB (while in U.S. waters)(Count 2 of the Indictment); and (3)

three (3) counts of witness tampering by company personnel, which are alleged to have occurred on board the vessel <u>after</u> arrival in Delaware, (Counts 3-5 of the Indictment).

It is clear that evidence of any discharge or alleged discharges occurring outside U.S. waters are wholly irrelevant to Counts 3-5 of the Indictment. Any and all such evidence, to the extent it may exist, does not make the existence of any fact that is of consequence to the determination of the action more probable or less probable, and is properly to be excluded under FRE 402.[19] Said another way, the introduction of evidence or allegations of such conduct provides no appreciable assistance to the trier of fact. Rather, the admission of such evidence or allegation would otherwise only serve to improperly allow the Government to unfairly prejudice the moving defendants by putting a proverbial "skunk in the jury box."

Similarly, evidence of any discharges or alleged discharges occurring outside U.S. waters are wholly irrelevant to Counts 1 & 2 of the Indictment. In short, the substantive crimes charged arise out of the Government's allegation that moving defendants knowingly failed to maintain an accurate ORB *"while"* in *U.S. waters.* In reviewing what conduct was "relevant" for purposes of a sentencing enhancement, the Third Circuit Court of Appeals expressly found that any such improper discharges were

---

[19] *See* <u>United States v. Quinto</u>, 582 F.2d 224, 232 (2d Cir. 1978)(holding that "Fed.R.Evid. 402 laconically states that evidence which is not relevant is not admissible," and "relevant" evidence is defined in Fed.R.Evid. 401 as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Needless to say, irrelevant evidence is evidence which does not possess such a tendency.

not relevant conduct **and** could not be considered part of the "offense" In summary, the

Third Circuit wrote:

> *. . . In sum, we conclude that Abrogar's "offense of conviction" – taking into account the text of the relevant provisions of APPS and accompanying regulations – was the "failure to maintain an accurate oil record book while in U.S. waters or in a U.S. port." Under that definition of the "offense of conviction," the improper discharges are not "relevant conduct," they cannot be considered part of the "offense" under the Guidelines, . . .*
> (emphasis added).

As such, it is respectfully submitted that any and all evidence and/or allegations of

discharges of oily sludge or bilge wastes outside of U.S. waters are wholly *irrelevant* to

the substantive crimes charged, **and** are properly to be excluded under FRE 402.

## CONCLUSION

For the reasons more fully set forth above, moving defendants respectfully request

that this Honorable Court issue an Order:

    (1) Granting moving defendants' application to dismiss Count 2 of the

        Indictment, or in the alternative, grant moving defendants' request for a bill of

        particulars detailing the deficiencies mentioned above in Count 2 of the

        Indictment, including but not limited to identification of the time, place, date,

        etc. of the act or omissions relating to the maintenance of the ORB within

        U.S. waters; and

    (2) Granting moving defendants' application for a bill of particulars for Counts 1,

        3-5, inclusive of the indictment; and

(3) Granting moving defendants' application to exclude any and all evidence and/or references to alleged discharges of oily sludge or bilge wastes occurring outside of U.S. waters; and

(4) For any and all such other and further relief which the Court deems to be just and proper under the specific circumstances of this matter.

Dated:  October 10, 2006

Respectfully submitted,

By: George M. Chalos
CHALOS, O'CONNOR & DUFFY, LLP
366 Main Street
Port Washington, NY 11050
Tel:  (516) 767 3600
Fax: (516) 767 3605
Email: gmc@codus-law.com

19

## CERTIFICATE OF SERVICE

I do hereby certify that, on this <u>10th day of October 2006</u>, I have served a copy of the foregoing pleading on counsel for all parties to this proceeding, by Email and by mailing the same by United States mail, properly addressed, and first-class postage prepaid to the following:

United States Department of Justice
U.S. Attorney's Office
Nemours Building
1007 N. Orange Street, Suite 700
Wilmington, Delaware  19801
Attn:  Edmond Falgowski, Esq.


United States Department of Justice
Environmental Crimes Section
P.O. Box 23985
L'Enfant Plaza Street
Washington, D.C. 20026
Attn:  Mark Kotila, Esq.
        Jeff Phillips, Esq.


Respectfully submitted,

By:  George M. Chalos
CHALOS, O'CONNOR & DUFFY, LLP
366 Main Street
Port Washington, NY 11050
Tel:  (516) 767 3600
Fax: (516) 767 3605
Email: gmc@codus-law.com

# EXHIBIT A

LEXSEE 459 F.3D 430

UNITED STATES OF AMERICA v. NOEL ABROGAR, Appellant

Case No: 06-1215

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

*459 F.3d 430; 2006 U.S. App. LEXIS 21156*

July 11, 2006, Argued
August 18, 2006, Filed

PRIOR HISTORY: [**1] On Appeal from the United States District Court for the District of New Jersey. District Court No. 05-cr-00649. District Judge: The Honorable Joseph H. Rodriguez.

COUNSEL: Carl R. Woodward, III (Argued), Kenneth L. Winters, Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, Roseland, New Jersey, Counsel for Appellant.

Michael T. Gray (Argued), Sue Ellen Wooldridge, John Smeltzer, Joseph Poux, Department of Justice, Washington, D.C., Counsel for Appellee.

JUDGES: Before: SMITH, ALDISERT, and ROTH, Circuit Judges.

OPINION BY: SMITH

OPINION:

[*431] OPINION OF THE COURT

SMITH, *Circuit Judge.*

Appellant Noel Abrogar pleaded guilty to a one-count Information charging him with failing to keep an accurate "oil record book" in violation of *33 U.S.C. § 1908(a)*, part of the legislation implementing an international anti-pollution treaty to which the United States is a signatory. On appeal, Abrogar challenges the District Court's application of a six-level sentencing enhancement pursuant to *§ 2Q1.3 of the United States Sentencing Guidelines* (the "Guidelines"), arguing in relevant part that under the text of *§ 2Q1.3* and other applicable Guidelines [**2] provisions, his offense did not "result[] in" the repeated discharges of oily waste upon which the sentencing enhancement was based. We agree. Accordingly, we will vacate Abrogar's sentence and remand the case to the District Court for resentencing. n1

n1 Abrogar also argues that the proper definition of "environment" in *§ 2Q1.3* excludes the discharges at issue here, and that, in any event, foreign conduct may not be considered in sentencing under the Guidelines. Because our reading of the "resulted in" language of *§ 2Q1.3*, without more, dictates that we remand the case for resentencing, we need not reach these issues.

I.

A.

Pollution discharges from ships are regulated by both U.S. and international law. The Act to Prevent Pollution from Ships ("APPS"), *33 U.S.C. § 1901 et seq.*, implements two related treaties to which the United States is a signatory. The first is the 1973 International Convention for the Prevention of Pollution from Ships, referred to as the MARPOL Protocol. [**3] The second is the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships. Together, the two treaties are generally referred to [*432] as MARPOL 73/78 ("MARPOL"), and more than 95% of the world's shipping tonnage is transported under the flags of signatories to these treaties.

Annex I to MARPOL sets forth regulations for the prevention of pollution by oil from ships. APPS authorizes the U.S. Coast Guard to issue regulations implementing the requirements of these two treaties. *33 U.S.C. § § 1903* and *1907*. The Coast Guard has issued such regulations incorporating MARPOL requirements. *See 33 C.F.R. § 151.01 et seq.*

Annex I sets out, *inter alia*, the international standards for the maximum amount of oil permitted to be discharged from ships. MARPOL also requires ships to have and maintain several pieces of equipment intended

to work together to measure the oil content of various waste and bilge discharges from ships and to divert discharges containing too much oil to storage tanks rather than allowing them to be discharged from the ship into the ocean.

In addition [**4] to prohibitions on oily waste discharges, the treaties require each oil tanker over a given weight to maintain a record known as an oil record book. MARPOL Annex I, Reg. 20(1). The oil record book must include records for (1) all transfers of oil; (2) management and disposal of oily wastes generated on board the vessel, including any discharges of dirty ballast or cleaning water from fuel oil tanks; and (3) the disposal of oily residues such as sludge, as well as discharges of bilge waste that has accumulated in machinery spaces. *Id.* at Reg. 20(2). Accidental or emergency discharges of oil or oily waste greater than 15 or 100 parts per million ("ppm") must also be recorded. These entries in the oil record book must be signed by the person in charge of the operation (in this case, Abrogar). *Id.* at Reg. 20(3). The oil record book must be maintained on board for not less than three years and must be kept on board the vessel and readily available at all reasonable times. *Id.*

The Coast Guard has the authority to board and examine the oil record book of any vessel while that vessel is in U.S. waters or at a U.S. port. *33 U.S.C. § 1904(c); 33 C.F.R. § 151.23(a)(3)* [**5] and *(c)*. The U.S. is a party to the international regime embodied in MARPOL and other treaties that require the country in which a ship is registered, known as the "flag state," to certify a ship's compliance with international standards. "Port states," such as the U.S. in this instance, conduct inspections to ensure compliance in their ports and waters. In conducting inspections, the Coast Guard typically relies on a ship's oil record book and statements of the crew to determine whether the crew is properly handling oil-contaminated water and its disposal. Failure of a ship to comply with MARPOL requirements can form the basis for U.S. action to refuse to allow that ship to enter port, to prohibit the ship from leaving port without remedial action, to refer the matter to the flag state of the vessel, or where appropriate, to prosecute the violation in the United States. *See 33 U.S.C. § 1908.*

B.

Noel Abrogar is a citizen of the Philippines and served as the Chief Engineer on the Motor Vessel Magellan Phoenix (the "Magellan"), a Panamanian-flagged ship managed by a Japanese company with corporate headquarters in Tokyo, Japan. Abrogar's term of service as [**6] Chief Engineer began when he boarded the Magellan on or about December 23, 2004, in Rotterdam. He was responsible for supervising the other engineers and oilers who worked in the engine room and for maintaining the ship's oil record book.

[*433] On March 25, 2005, Coast Guard inspectors conducted a port-control inspection of the Magellan to determine, *inter alia*, compliance with MARPOL requirements. In the course of their inspection and subsequent investigation, inspectors discovered that shortly after departing Rotterdam in December of 2004, Abrogar learned that a crew member intended to execute an improper discharge of bilge waste into the ocean. Abrogar did nothing to prevent the discharge. Prior to the ship's arrival in Panama on January 4, 2005, Abrogar made an entry in the oil record book indicating that the bilge waste and oily water from the improper discharge (and perhaps other, earlier improper discharges) had been incinerated.

The inspectors also learned that at least four other times, Magellan crew members under Abrogar's command -- and with his knowledge -- discharged oil sludge and other oil-contaminated waste into the ocean. Abrogar himself issued the order to discharge [**7] on at least one of these occasions. He continued to knowingly make false entries in the oil record book and intentionally failed to record the improper discharges in an attempt to conceal those discharges. During the inspection and subsequent Coast Guard investigation, Abrogar lied to inspectors and denied knowing about any illegal discharges. He maintained that his recordings in the oil record book were accurate.

Abrogar eventually admitted to his knowledge of the improper discharges, his ordering of one such discharge, and his falsification of the oil record book. On September 7, 2005, Abrogar pled guilty to a one-count Information charging him with failing to maintain an accurate oil record book as required by *33 C.F.R. § 151.25*, in violation of *33 U.S.C. § 1908(a)*.

The Pre-Sentence Report correctly stated that the applicable Guidelines section in the case is *§ 2Q1.3*, which provides for a base offense level of six. The report also recommended a six-level enhancement pursuant to *§ 2Q1.3(b)(1)(A)* ("Specific Offense Characteristics"), which provides for such an enhancement if "the offense resulted in an ongoing, continuous, or repetitive [**8] discharge, release, or emission of a pollutant into the environment." Although the District Court noted the tension between a "jurisdictional question and . . . what appears to be the broad sweep of the relevant conduct factors," the Court accepted the recommendation for the six-level enhancement and, owing to the enhancement as well as other sentencing factors, sentenced Abrogar to 12 months and one day of imprisonment followed by three years of supervised release. Abrogar timely appealed, specifically challenging the six-level increase under *§*

2Q1.3(b)(1)(A) as an "incorrect application of the sentencing guidelines" under *18 U.S.C. § 3742(a)(2)*. We granted Abrogar's motion to expedite the appeal and now address the District Court's application of the sentencing enhancement.

### C.

The District Court had original jurisdiction pursuant to *18 U.S.C. § 3231*. We exercise appellate review under *28 U.S.C. § 1291* and *18 U.S.C. § 3742(a)(2)*, granting U.S. courts of appeals jurisdiction to review sentences "imposed as a result of an incorrect application of the sentencing guidelines." *18 U.S.C. § 3742(a)(2)*. [**9] We review the District Court's interpretation of the Guidelines de novo. n2 *United States* [*434] *v. Pojilenko, 416 F.3d 243, 246 (3d Cir. 2005)* (quoting *United States v. Booker, 543 U.S. 220, 259 (2005), 125 S. Ct. 738, 160 L. Ed. 2d 621)*.

        n2 This Court has held that even under the post-*Booker* advisory Guidelines regime, district courts must accurately "consider, among other things, 'the Guidelines' sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant.'" *United States v. Pojilenko, 416 F.3d 243, 246 (3d Cir. 2005)* (quoting *United States v. Booker, 543 U.S. 220, 259, 125 S. Ct. 738, 160 L. Ed. 2d 621 2005)*).

### II.

### A.

The Government's primary argument in favor of the sentencing enhancement is textual in nature and runs essentially thus: the repeated discharges directed and knowingly allowed by Abrogar are "relevant conduct" *vis-a-vis* his offense of failure to maintain an accurate oil record book. Under the text of the Guidelines, [**10] the definition of "offense" includes the "offense of conviction" and all "relevant conduct." As such, Abrogar's "offense" as defined by the Guidelines "resulted in" repeated discharges of a pollutant, and the District Court properly applied the six-level sentencing enhancement.

We begin our analysis with the text of the relevant provisions of the Guidelines. As mentioned above, the six-level sentence enhancement adopted by the District Court was proper under *§ 2Q1.3 of the Guidelines* only if Abrogar's "offense resulted in an ongoing, continuous, or repetitive discharge, release, or emission of a pollutant into the environment." *Id. Section 1B1.1 of the Guidelines* defines one's "offense" as "the offense of conviction and all relevant conduct under *§ 1B1.3* (Relevant Con-

duct)." *U.S.S.G. § 1B1.1, application note 1(H)*. The parties here have referred to *§ 1B1.3(a)(1)*, which defines "relevant conduct" as "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the [**11] course of attempting to avoid detection or responsibility for that offense." *U.S.S.G. § 1B1.3(a)(1)*.

In order to determine the scope of "relevant conduct" under the Guidelines, we must first define Abrogar's "offense of conviction." As Abrogar correctly points out, Congress did not make every violation of MARPOL by every person a crime under U.S. law. The APPS, the federal law implementing MARPOL, restricts applicability of the substantive provision violated by Abrogar. *33 U.S.C. § 1902*, entitled "Ships subject to preventive measures," states as follows:

    (a) Included vessels

    This chapter shall apply --

    (1) to a ship of United States registry or nationality, or one operated under the authority of the United States, *wherever located*;

    (2) with respect to Annexes I and II of the Convention, to a ship, other than a ship referred to in paragraph (1), *while in the navigable waters of the United States*;

    (3) with respect to the requirements of Annex V of the Convention, to a ship, other than a ship referred to in paragraph (1), *while in the navigable waters or the exclusive economic zone of the United* [**12] *States*; and

    (4) with respect to the regulations prescribed in *section 1905* of this title, *any port or terminal in the United States*.

*33 U.S.C. § 1902(a)* (emphasis added). In sum, Congress made *§ 1908(a)*'s criminalization of MARPOL violations applicable only to U.S. ships, wherever located, and foreign ships in three specific circumstances: (1) "while" the ship is within "the navigable waters of the United States"; (2) [*435] "while" in the "exclusive economic zone of the United States"; and (3) when at a port or terminal in the United States.

Pursuant to the plaintext of the APPS, the Coast Guard regulations giving rise to Abrogar's violation contain restrictions on their applicability that are substantially identical to those set forth in the APPS. The substantive regulation that requires the proper maintenance of an oil record book is 33 C.F.R. § 151.25. 33 C.F.R. § 151.09, however, is entitled "Applicability," and it provides:

> § § 151.09 through 151.25 apply to each ship that -- [is operated "under the authority of the United States" in four specific circumstances], "or (5) Is operated [**13] under the authority of a country other than the United States *while in the navigable waters of the United States, or while at a port or terminal under the jurisdiction of the United States.*

*Id.* (emphasis added).

We conclude, therefore, that under the APPS and accompanying regulations, Congress and the Coast Guard created criminal liability for foreign vessels and personnel only for those substantive violations of MARPOL that occur in U.S. ports or waters. Stated differently, a MARPOL violation by such a vessel or its personnel is only an "offense" under U.S. law if that violation occurs within the boundaries of U.S. waters or within a U.S. port. As such, the precise nature of Abrogar's "offense of conviction" under the Guidelines is most accurately described as "failure to maintain an accurate oil record book *while in the navigable waters of the United States.*"

By contrast, the Government's argument in favor of the enhancement assumes that the "offense of conviction" of which Abrogar is guilty -- failure to maintain an accurate oil record book -- occurred for "offense-defining" purposes not only within U.S. waters, but during the whole of Abrogar's tenure on the [**14] Magellan -- or at least from the moment at which he entered the first false entry in the oil record book. At oral argument, however, the Government conceded that to conceive of Abrogar's offense of conviction in those terms would require a "broad" reading of the APPS and relevant Coast Guard regulations. Indeed, we believe that the reading of the relevant provisions urged by the Government is so broad as to contravene the very meaning of those provisions. As discussed above, the United States has no jurisdiction to prosecute a foreign vessel or its personnel for "failure to maintain an accurate oil record book" outside of U.S. waters. Furthermore, no provision of the APPS or its accompanying regulations indicates that "failure to maintain an accurate oil record book" by a foreign ship outside U.S. waters is a crime. n3 Stated differently, the terms of the Act and its regulations *exclude* from criminal liability the "failure to maintain an accurate oil record book" by foreign vessels outside U.S. waters.

> n3 We find this latter point particularly significant analytically. The APPS provisions and regulations cited above do not merely implicate jurisdiction. They are worded in such a way as to define, for purposes of U.S. law, the scope within which MARPOL violations constitute crimes at all, irrespective of implications for jurisdiction proper. As such, the provisions and regulations speak substantively to what can be called an "offense" under the Guidelines.

[**15]

Assuming that the proper scope of Abrogar's offense of conviction is the knowing "failure to maintain an accurate oil record book within U.S. waters," the Government's assertion that "[u]nder the [*436] Sentencing Guidelines, th[e] [improper] discharges are relevant conduct for purposes of determining the total offense level" is incorrect. The Government acknowledged at oral argument -- and the paper record before us indicates -- that none of the improper discharges at issue occurred within U.S. waters. As such, none of the illegal discharges "occurred during the commission of the offense of conviction." § 1B1.3. Nor can it reasonably be asserted that the discharges took place "in preparation for that offense." *Id.* Nor did the discharges take place "in the course of attempting to avoid detection or responsibility for" maintaining a false oil record book within U.S. waters. *Id.* In fact, the reverse is true. The "offense of conviction" -- maintaining a false oil record book -- occurred in the course of attempting to avoid detection of the illegal discharges. In short, the improper discharges simply do not fit within the textual parameters of § 1B1.3's definition of "relevant [**16] conduct" *vis-a-vis* the "offense of conviction" as properly defined.

If the discharges are not relevant conduct, then the Government's argument collapses. The Government summarizes its textual argument by asserting that because the improper discharges "are relevant conduct, they are considered part of the 'offense' as that term is used in the Guidelines, and therefore the 'offense' resulted in the repeated discharge of oily bilge wastes and oily sludges into the ocean." We conclude that the converse of the Government's position is true: because the improper discharges are not relevant conduct, they cannot be considered part of the "offense" under the Guide-

459 F.3d 430, *; 2006 U.S. App. LEXIS 21156, **

lines, and therefore the "offense" did not "result[] in" repeated discharges, as is required before the six-level enhancement under § 2Q1.3 may be applied. Accordingly, we reject the Government's argument that the text of the APPS and the Guidelines supports the sentencing enhancement applied by the District Court in this case.

B.

Perhaps sensing the weakness of its textual argument under the Guidelines, the Government also raises a policy argument in favor of the sentencing enhancement. It argues that the structure of [**17] § 2Q1.3 reflects a general policy of enhancing sentencing for recordkeeping offenses to account for damage wrought by any underlying substantive offense. The Government relies on § 2Q1.3(b)(5), which provides that "[i]f a recordkeeping offense reflected an effort to conceal a substantive environmental offense, use the offense level for the substantive offense." Id.

We find this argument unavailing for at least two reasons. First, because criminal liability for MARPOL violations by a foreign vessel does not attach until that vessel enters U.S. waters, the improper discharges at issue here -- all of which occurred outside U.S. waters on this record -- do not constitute "substantive environmental offense[s]" under U.S. law anymore than the failure to maintain an accurate oil record book outside U.S. waters constitutes a recordkeeping offense under U.S. law. Thus, the policy contemplated by § 2Q1.3(b)(5) -- seeking to punish substantive environmental offenses under U.S. law -- would not be frustrated by vacating the enhancement as applied in this case.

Second, even if we were to accept the Government's policy argument as to § 2Q1.3 considered in isolation, any policy concerns [**18] implicit in § 2Q1.3(b)(5)

must yield to the plain meaning of the other Guidelines and statutory provisions at issue in this case. As discussed above, the Government's assertion that the improper discharges constitute "relevant conduct" [*437] fails under the plain meaning of § 1B1.3. In addition to the general rule that plain text trumps implicit policy concerns as a matter of statutory construction, we must consider the fact that § 1B1.3 applies to all of the individual substantive provisions of the Guidelines and reflects the broader will of Congress as to a fundamental aspect of sentencing policy -- the scope and type of collateral conduct to be included in sentencing. Furthermore, any policy concern implied by the Guidelines must be subordinated to the scope of liability and applicability explicitly set forth by Congress as part of the substantive statute at issue. Here, criminal liability under 33 U.S.C. § 1908(a) is plainly limited by § 1902 and the regulations accompanying the APPS. The Government's policy argument is thus unavailing.

III.

In sum, we conclude that Abrogar's "offense of conviction" -- taking into account the text of the relevant provisions [**19] of the APPS and accompanying regulations -- was the "failure to maintain an accurate oil record book while in U.S. waters or in a U.S. port." Under that definition of the "offense of conviction," the improper discharges are not "relevant conduct," they cannot be considered part of the "offense" under the Guidelines, and therefore the "offense" did not "result[] in" repeated discharges of a pollutant. As such, the District Court erred in applying the six-level sentencing enhancement.

For the foregoing reasons, we will vacate Abrogar's sentence and remand the case to the District Court for resentencing.