IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------X

UNITED STATES OF AMERICA

Plaintiff,

Criminal Action No. 06-76 (GMS)

v.

CHIAN SPIRIT MARITIME ENTERPRISES, INC.,
VENETICO MARINE S.A., *et al.*

Defendants.

-------------------------------------------------------------X

### DEFENDANTS, CHIAN SPIRIT MARITIME ENTERPRISES, INC. AND VENETICO MARINE, S.A.'s, MOTION FOR RECONSIDERATION

**COME NOW,** moving defendants, Venetico Marine, S.A. ("Venetico") and

Chian Spirit Maritime Enterprises, Inc. ("CSME")(collectively, "moving defendants"),

who respectfully request that this Honorable Court reconsider its October 27, 2006

decision to deny moving defendants motion to dismiss Count 2 of the Indictment, and

motion to exclude, in order to correct an error of law and to prevent manifest injustice.

### APPLICABLE LAW

The purpose of a motion for reconsideration is, *inter alia,* to correct manifest

errors of law. Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985). Although the

Federal Rules of Criminal Procedure do not expressly provide for a motion to reconsider,

common law doctrines have long recognized such motions. United States v. Grenier,

2006 U.S. Dist. LEXIS 62950 (N.D. Ohio, Sept. 5, 2006). *See also*, Seawright v. Carroll,

2004 U.S. Dist. LEXIS 3267 (D.Del 2004), (District Court of Delaware considered a

Motion for Reconsideration with regard to a petition for a writ of habeas).

1

Courts presented with motions for reconsideration in criminal cases typically evaluate such motions under the same standards as those applicable to a civil motion to alter or amend judgment under *Rule 59(e) of the Federal Rules of Civil Procedure. See* Seawright v. Carroll, *supra.* Moreover, a Court may grant a motion for reconsideration if the moving party shows one of the following: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court issued its order; or (3) the need to correct a clear error of law or fact or to prevent a manifest injustice. Max's Seafood Cafe v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999)(citing North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995).

For the reasons more fully set forth below, this Honorable Court is respectfully requested to reconsider its October 27, 2006 decision denying moving defendants motion to dismiss Count 2 of the Indictment, and motion to exclude, as it is respectfully submitted that the Court has erred *as a matter of law,* and that correcting its error(s) before trial is necessary in order to prevent manifest injustice to moving defendants.

## POINT I

### WITH RESPECT, THE COURT HAS MANIFESTLY ERRED, *AS A MATTER OF LAW,* IN ITS INTERPRETATION AND APPLICATION OF APPS AND ITS REGULATIONS, WHICH MUST BE CORRECTED BEFORE TRIAL IN ORDER TO PREVENT MANIFEST INJUSTICE TO MOVING DEFENDANTS.

#### a.  Count 2 of Indictment fails to allege criminal conduct under applicable US law and regulation.

As noted by the Court, the substantive charge presented in Count 2 of the Indictment is, in sum and substance, that moving defendants *"did knowingly fail to maintain, an accurate Oil Record Book for the IRENE in which all unprocessed overboard discharges of oily sludge and bilge wastes from the IRENE were required to*

2

*be fully recorded . . . in violation of Title 33, United States Code, Section 1908(a)[1] . . .*
*and Title 33, Code of Federal Regulations, Section 151. 25."* See Indictment, at
paragraphs 31 & 32.

Here, the specific charge against moving defendants in Count 2 is that [they] *"did*
*knowingly fail to maintain, an accurate Oil Record Book for the IRENE in which all*
*unprocessed overboard discharges of oily sludge and bilge wastes from the IRENE were*
*required to be fully recorded* as per 33 CFR §151.25.   There is no dispute that there are
absolutely no allegations of any overboard discharges of sludge or oily wastes within
U.S. waters presently before the Court.  Similarly, there are no allegations that there were
any intentional, affirmative failures to record any such overboard discharge occurring
within U.S. waters.  In fact, the Government readily conceded such points at oral
argument before the Court on October 27, 2006.  Nevertheless, the Court denied moving
defendants' application to dismiss Count 2 of the Indictment.

There can be no meaningful dispute that 33 USC §1902 expressly restricts and
limits the United States jurisdiction to prosecute alleged 33 USC §1908(a) violations
occurring on board the M/V IRENE E.M. to acts or omissions occurring *while in the*
*navigable waters of the United States.*  Specifically, 33 USC §1902, provides, in
pertinent part:

**Sec. 1902. Ships subject to preventive measures**
(a) Included vessels

_____

1 As the Court is aware, Title 33, United States Code, Section 1908(a), provides, in relevant part:

*A person who knowingly violates the MARPOL Protocol, Annex IV to the Antarctic*
*Protocol, this chapter or the regulations issued thereunder commits a class D felony.*

This chapter shall apply -
(1) to a ship of United States registry or nationality, or one
operated under the authority of the United States, wherever
located;
(2) with respect to Annexes I and II to the Convention, to a
ship, **other than a ship referred to in paragraph (1),
while in the navigable waters of the United States;**

\* \* \*

Similarly, the relevant Regulation, 33 C.F.R. §151.09, contains a nearly identical

limitation and jurisdictional restriction. Specifically, 33 C.F.R. §151.09 provides, in

pertinent part:

> *[Sections] 151.09 through 151.25 apply to each ship that --
> [operated under the authority of the United States in four specified
> circumstances] or; (5) is operated under the authority of a country
> other than the United States **while in the navigable waters of the
> United States, or while at a port or terminal under the
> jurisdiction of the United States.** "*(emphasis added).

For the Courts ready reference, a copy of 33 CFR §151.25, the relevant U.S.

Regulation, which mandates that a foreign-flagged vessel such as the M/V IRENE E.M-

under specifically enumerated circumstances *while in the navigable waters of the United*

*States –* must undertake to meet certain recording obligations vis-à-vis the vessel's Oil

Record Book, is attached hereto as Exhibit "A".

As a strict *matter of law*, 33 CFR §151.25, *only* imposes any such recording

requirements for discharges and/or transfers occurring while the vessel is *in the navigable*

*waters of the United States, or while at a port or terminal under the jurisdiction of the*

*United States." See* 33 CFR §151.09(a)(5). Said another way, there is no requirement

under either U.S. law or Regulation for the subject vessel or its crew to maintain an Oil

4

Record Book and/or record any *unprocessed overboard discharges of oily sludge and bilge wastes* occurring outside of U.S. waters.

Moreover, while it is clear that the United States has the express authority to inspect a foreign flagged ship such as the M/V IRENE E.M. while at a U.S. port[2], the United States, (as set forth in 33 USC §1902 and 33 CFR §151.09), clearly, unambiguously and expressly **_lacks_** jurisdiction and authority to regulate, prosecute and/or punish alleged MARPOL violations occurring *outside* of U.S. waters. In other words, while moving defendants concede that the U.S. Coast Guard is expressly

---

2 Specifically, 33 CFR 151.23 provides:

§ 151.23 Inspection for compliance and enforcement.

(a) While at a port or terminal under the jurisdiction of the United States, a ship is subject to inspection by the Coast Guard--

(1) To determine that a valid IOPP Certificate is on board and that the condition of the ship and its equipment corresponds substantially with the particulars of the IOPP Certificate;

(2) To determine that evidence of compliance with MARPOL 73/78, as required by § 151.21 is on board and that the condition of the ship and its equipment corresponds substantially with the particulars of this evidence of compliance;

(3) To determine whether a ship has been operating in accordance with and has not discharged any oil or oily mixtures in violation of the provisions of MARPOL 73/78 or this subchapter;

(4) To determine whether a ship has discharged oil or oily mixtures anywhere in violation of MARPOL 73/78, upon request from a party to MARPOL 73/78 for an investigation when the requesting party has furnished sufficient evidence to support a reasonable belief that a discharge has occurred.

(b) A ship that does not comply with the requirements of Parts 151, 155 and 157 of this chapter, or where the condition of the ship or its equipment does not substantially agree with the particulars of the IOPP Certificate or other required documentation, may be detained by order of the COTP or OCMI, at the port or terminal where the violation is discovered until, in the opinion of the detaining authority, the ship can proceed to sea without presenting an unreasonable threat of harm to the marine environment. The detention order may authorize the ship to proceed to the nearest appropriate available shipyard rather than remaining at the place where the violation was discovered.

(c) An inspection under this section may include an examination of the Oil Record Book, the oil content meter continuous records, and a general examination of the ship. A copy of any entry in the Oil Record Book may be made and the Master of the ship may be required to certify that the copy is a true copy of such entry.

authorized to conduct an inspection of the M/V IRENE E.M. "while at a port or terminal under the jurisdiction of the United States" (to determine if she is operating in accordance with MARPOL treaty requirements), substantive jurisdiction to prosecute a violation of MARPOL allegedly (and/or actually) occurring outside of U.S. waters is **_not_** conferred.

Again, the Third Circuit Court of Appeals has already held, in clear **_and_** mandatory terms, that _APPS and its regulations expressly **exclude** from criminal liability the failure to maintain an accurate oil record book by foreign vessels outside U.S. waters_. _See_ United States v. Abrogar, 459 F.3d 430 (3d Cir. 2006).

By the Government's failure to allege that moving defendants knowingly failed to _maintain an accurate Oil Record Book for the IRENE **while in U.S. waters**;_ by the Government's failure to allege that there were any _unprocessed overboard discharges of oily sludge and bilge wastes from the IRENE **occurring within U.S. waters;**_ and by the Government's failure to allege that any alleged Oil Record Book omissions **_occurred while in U.S. waters_**, it is respectfully submitted that Count 2 of the Indictment must be dismissed _as a matter of law,_ as it fails to properly allege _any_ criminal conduct under U.S. law.[3]

Accordingly, in view of the foregoing and in order to prevent manifest injustice, moving defendants respectfully request that this Honorable Court reconsider its' prior denial of defendants motion to dismiss Count 2, and dismiss Count 2 of the Indictment before trial.

---

3 _See also_, U.S. v. Baker, 136 F.Supp 546 (S.D.N.Y. 1955) (dismissing Indictment on ground that United States had no power to indict and try an alien for a crime committed abroad, when the crime was completed outside of the U.S. and no further acts within the United States were necessary).

**b.  *Respectfully, this Honorable Court has misinterpreted and misapplied the rationale and reasoning of the U.S. District Court for the Southern District of Florida in U.S. v. Royal Caribbean Cruises, Ltd. to this matter.***

At oral argument, this Honorable Court clearly stated that while it did not find the

U.S. v. Royal Caribbean[4] decision as controlling, it found the Southern District of

Florida's *reasoning* to be persuasive authority to retain jurisdiction over Count 2 of the

Indictment.  Specifically, Your Honor indicated that the Court was denying moving

defendants' application on the basis that the vessel did, indeed, present the Oil Record

Book to Coast Guard officials upon arrival at Delaware; an act which occurred within

U.S. waters and within U.S. jurisdiction. With respect, and for the reasons more fully set

forth below, moving defendants respectfully submit that the Court has misapplied the

rationale and reasoning employed in the Royal Caribbean case to the instant matter, and

that in order to prevent a manifest injustice to moving defendants, Count 2 of the

Indictment must be dismissed *as a matter of law*.

As an initial matter, and as briefly addressed at oral argument, the Royal

Caribbean case was ***not*** a prosecution under APPS (33 USC §1908(a)), as is the case

here.  Rather, the theory of prosecution was a "false statement" prosecution under 18

USC §1001.  Specifically, in that matter, Royal Caribbean was charged under 18 U.S.C.

§1001[5], for the knowing and willful presentation of a false writing, specifically the cruise

---

4 *See* United States v. Royal Caribbean Cruises, Ltd.,11 F. Supp. 2d 1358(S.D. Fl. 1998); 1998 U.S. Dist. LEXIS 7351; 1998 AMC 1817.

5 As the Court is aware, 18 USC § 1001 provides:

> *§ 1001 – Statements or entries generally*
> *Except as otherwise provided in this section, whoever, in any manner within the*
> *jurisdiction of the executive, legislative, or judicial branch of the Government of the*
> *United States, knowingly and willfully –*
> *(1)      falsifies, conceals, or covers up by any trick, scheme, or device a material fact;*

ship Nordic Empress' Oil Record Book; to the United States Coast Guard; during a port state control inspection; in the port of Miami on February 1, 1993.

As for the relevant facts, on February 1, 1993, a U.S. Coast Guard aircraft on patrol observed the Nordic Empress discharging oil in Bahamian waters, en route to her final port of destination, Miami, Florida. Upon arrival at Miami, the Coast Guard conducted a document and safety inspection. During its review of the Oil Record Book, it was observed that there was no entry for the observed overboard discharge of oil on February 1, 1993. *Based upon the suspicion that an alleged discharge violation had occurred, the United States* (as should have been done here, but was not) *referred the substantive MARPOL violation to representatives of the government of Liberia, the vessel's flag state, via the Department of State.* Thereafter, on February 19, 1998, an indictment was sought and obtained in Florida for alleged violation(s) of 18 U.S.C. §1001 occurring within U.S. waters. Specifically, the Indictment charged violations of 18 U.S.C. §1001 for acts which occurred during the U.S. Coast Guard inspection at Miami and not the substantive MARPOL violations which allegedly occurred in Bahamian waters.

In challenging the Court's jurisdiction to prosecute under 18 U.S.C. §1001, Defendants argued that: because there is no U.S. authority to regulate the conduct (*i.e.*

---

<blockquote>
(2)     *makes any materially false, fictitious, or fraudulent statement or representation; or*

(3)     *makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;*

*shall be fined under this title or imprisoned not more than 5 years, or both.*
</blockquote>

discharges occurring outside the navigable waters of the United States), the Oil Record

Book and its entries, or lack of, were not within the jurisdiction of the United States or

the U.S. Coast Guard.  Defendants further argued that the absence of a legal duty under

U.S. law to make an entry in the Oil Record Book (for the February 1, 1993 discharge)

mandated dismissal, as there could be no prosecution under §1001 for false statement by

omission or concealment when no such disclosure is required.[6]

In opposition, the Government contended, however, that the alleged criminal

conduct before the Court was <u>not</u> the discharge of oil at sea and the corresponding failure

to record the discharge at that time, (such as is the case here), but rather the *presentation*

of a materially false Oil Record Book to the U.S. Coast Guard, along with the false

statements of the Chief Engineer—both of which having occurred during the Coast Guard

inspection within the port of Miami; both of which occurring within the jurisdiction of

the United States; and both of which falling strictly within the scope, authority and

jurisdiction of 18 U.S.C. §1001.  Specifically, the Government argued – and the Court

agreed -- that the United States had jurisdiction to prosecute the ship owner under 18

U.S.C. §1001 for the alleged (1) knowing and willful criminal acts by the vessel's crew;

(2) which occurred within U.S. waters; (3) by way of their presentment, upon request, of

a materially false Oil Record Book to U.S. Coast Guard officials; (4) in a matter that was

within the jurisdiction of the U.S. Coast Guard; (5) accompanied by the further false

statement(s) by the vessel's Chief Engineer relating to the veracity and accuracy of the

Oil Record Book.  Again, it was the Government's position that all of the alleged

---

6 As the Court is now keenly aware, the *only* domestic statute requiring entries in Oil Record Book relating
to discharges is found in APPS, and APPS only allows the United States to regulate foreign-flagged vessels
*while in the navigable waters of the United States. See* 33 U.S.C. 1902(a)(2).

criminal conduct occurred squarely within U.S. waters, specifically, within the Port of Miami, and allegedly in violation of, and pursuant to the jurisdictional authority conferred by, 18 U.S.C. §1001. In that matter, unlike here, the Government implicitly acknowledged the jurisdictional limitations set forth in APPS and its regulations, and proceeded to prosecute under the general "false statement" statute, as opposed to the more specific, APPS, for the acts which occurred within U.S. waters.

In exercising jurisdiction over §1001 charges, the court confirmed that under APPS, the United States, via the U.S. Coast Guard, has the duty and the obligation to board and inspect ships while at a U.S. port and to pursue appropriate measures to address any violations occurring within U.S. waters. *See*, 33 U.S.C. §1907(c)(1) & (c)(2). The court further stated, that such actions are part of the regularly conducted activities of the U.S. Coast Guard, and *__false statements__* made in connection with those activities fall within the United States' jurisdiction under 18 U.S.C. §1001. Whether or not the United States had the authority to regulate either the alleged February 1, 1993, unauthorized discharge from the Nordic Empress or any attendant Oil Record Book violations at the time did *not* bear upon the inquiry as to whether the United States has jurisdiction to prosecute a foreign-flagged ship owner under 18 U.S.C. §1001 for alleged criminal conduct which started, completed and otherwise occurred strictly within the port of Miami, Florida.[7]

---

[7] In fact, the Court expressly did not render any decision or comment as to the vessel's obligations to record in its oil record book, pursuant to MARPOL, any discharges occurring outside of U.S. waters and/or the United States' jurisdiction to enforce any such omissions. Specifically, the Court wrote: . . *It is not necessary to reach the questions of the obligation of RCCL to record various entries in the Oil Record Book while outside the jurisdiction of the United States and the attendant ability of the United States to enforce any omissions thereof* . .

As a matter of law, it is clear that APPS (*i.e.* - 33 USC §1908(a)) and its' relevant Regulations (*i.e.* - 33 CFR §151.25), are, *as a matter of law,* not nearly as broad in their scope or application as 18 USC §1001. Specifically, in providing a further explanation in support of its exercise of jurisdiction over the 18 USC §1001 charges, the U.S. District Court for the Southern District of Florida wrote:

> *. . . We first start with the premise that jurisdiction based upon [section] 1001 should not be unnecessarily confined. Indeed, the "United States Supreme Court has stated that jurisdiction within the meaning of section 1001 should not be narrowly or technically defined (citations omitted) . . .*

> \* \* \*

> *Under the law as developed in the Eleventh Circuit, the fact that the alleged false statement in a [section ]1001 case was not made within the jurisdictional bounds of the United States is not necessarily fatal to the claim. (citations omitted) . .*

> \* \* \*

> *. . Rather, the correct analysis is to consider the whether documents containing the alleged false statement are routinely or commonly used by the United States officials during the course of their regularly conducted activities. <u>If the documents are, and the prima facie requirements of the five elements of a [section] 1001 claim are met —a statement; falsity; materiality; specific intent; and agency jurisdiction —then the statement is actionable under [section] 1001.</u> (citations omitted)(emphasis added).*

While moving defendants aknowledge that the court further stated that 18 U.S.C. §1001, APPS and APPS' regulations are complimentary, they are, in no way, identical and/or otherwise interchangeable, as the Government has erroneously contended in this matter. Perhaps more to the point, there can be no meaningful dispute that the Third Circuit has expressly spoken on the limited scope and jurisdictional reach afforded to the United States under APPS and its implementing regulations.

11

Specifically, the Third Circuit has held, in mandatory terms, that: *the terms of the Act [APPS] and its regulations expressly **exclude** from criminal liability the failure to maintain an accurate oil record book by foreign vessels outside U.S. waters.* See <u>United States v. Abrogar</u>, 459 F.3d 430 (3d Cir. 2006). Further in this regard, there can be no dispute that the Third Circuit has further clarified that, under APPS:

> *... the United States has no jurisdiction to prosecute a foreign vessel or its personnel for "failure to maintain an accurate oil record book" outside of U.S. waters. Furthermore, <u>no provision of the APPS or its accompanying regulations indicates that "failure to maintain an accurate oil record book" by a foreign ship outside U.S. waters is a crime. Stated differently, the terms of the Act and its regulations exclude from criminal liability the failure to maintain an accurate oil record book" by foreign vessels outside U.S. waters.</u>*

> \* \* \*

Again, prior to the Third Circuit's decision in <u>Abrogar</u>, the proper scope and extent of U.S. jurisdiction to prosecute a foreign flagged ship for alleged MARPOL violations occurring outside of U.S. waters under APPS was an open question, as such a precise question had never been raised before any Court.

Accordingly, for the reasons set forth above, moving defendants respectfully request this Honorable Court to reconsider its' prior denial of defendants motion to dismiss Count 2, and dismiss Count 2 of the Indictment before trial in order to prevent manifest injustice to moving defendants.

### *c.  The Court has relied upon a flawed analogy in denying moving defendants' motion to dismiss Count 2 of the Indictment.*

As discussed during oral argument, this Honorable Court clearly took issue with moving defendants' contention that the United States lacks authority to prosecute MARPOL violations occurring on a foreign-flagged ship **outside** of U.S. waters under APPS, (*i.e.* - 33 USC §1908(a)).  In this regard, the Court disagreed by stating, in sum and substance, that: if the Court was to accept moving defendants argument that the United States lacks jurisdiction to prosecute such conduct occurring on a foreign-flagged vessel  beyond the U.S. territorial sea, then the U.S. would be without authority to prosecute a substantive MARPOL violation (hypothetically occurring thirteen (13) miles from the U.S. shore line (i.e.- one (1) mile beyond the U.S. territorial sea)), irrespective of the fact that oil would be headed towards U.S. waters and shores and would otherwise impact and damage the United States—which, in the Court's view, simply did not "make sense."

To be clear, moving defendants did not, and do not, contend that the United States is without authority, jurisdiction and/or remedy under such hypothetical circumstance. Rather, as undersigned counsel alluded at oral argument, moving defendants agree that there are various *other* statutes (*i.e.* – statutes *other* than APPS), which expressly confer jurisdiction in such situations (*i.e.* - the hypothetical situation posed by the Court). *See i.e.*- the Oil Pollution Act of 1990, 33 U.S.C. §2702, (which expressly confers jurisdiction over a responsible party for a vessel or a facility from which oil is  discharged, or which

poses *"a substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone[8]").*

However, based upon the applicable law as it presently exists; the express jurisdictional limitations set forth in APPS and its implementing Regulations (*i.e.* -- the underpinnings of the charges set forth in Count 2 of the Indictment); the express holding of the Third Circuit in <u>Abrogar;</u> and for the reasons stated above, moving defendants respectfully submit that the Indictment's failure to allege that any overboard discharges of sludge or oily wastes occurred within U.S. waters; **and** by the Indictment's failure to allege that any intentional omissions (to record any overboard discharge) occurred within U.S. waters, moving defendants respectfully submitted that Count 2 of the Indictment must be dismissed, *as a matter of law.*

Accordingly, moving defendants respectfully request this Honorable Court reconsider its' prior denial of defendants motion to dismiss Count 2, and dismiss Count 2 of the Indictment before trial in order to prevent manifest injustice to moving defendants.

---

8 For the Court's reference, moving defendants confirm that the U.S. Exclusive Economic Zone extends to a distance of 200 nautical miles from the baseline from which the breadth of the territorial sea is measured. *See* <u>Proclamation 5030,</u> 48 FR 10605 (March 10, 1983).

## POINT II

### IF, UPON RECONSIDERATION, THE COURT GRANTS MOVING DEFENDANTS APPLICATION TO DISMISS COUNT 2 OF THE INDICTMENT, ALL EVIDENCE AND/OR ALLEGATIONS OF DISCHARGES OF OILY SLUDGE OR OILY WASTE OCCURRING OUTSIDE OF U.S. WATERS WILL BE WHOLLY *IRRELEVANT* TO THE REMAINING CRIMES CHARGED IN COUNTS 1, 3-5 AND IS PROPERLY TO BE EXCLUDED UNDER FRE 402.

If, upon reconsideration, the Court grants moving defendants' motion to dismiss Count 2 of the Indictment, evidence of any discharge or alleged discharges occurring outside U.S. waters are wholly irrelevant to Counts 1, 3-5 of the Indictment, and moving defendants respectfully submit should be excluded *as a matter of law*.

As more fully set forth in moving defendants initial application in this regard, assuming dismissal of Count 2, any and all such evidence and/or allegation, to the extent it may exist, does not make the existence of any fact of consequence to the determination of the remaining counts in the Indictment more probable or less probable, and is properly to be excluded under FRE 402. Said another way, the introduction of evidence or allegations of such conduct will provide no appreciable assistance to the trier of fact; and the admission of such evidence or allegation(s) would otherwise only serve to unfairly prejudice moving defendants.

Accordingly, moving defendants respectfully request this Honorable Court to reconsider its' prior denial of defendants motion to exclude evidence of any discharge or alleged discharges occurring outside U.S. waters, before trial and in order to prevent manifest injustice to moving defendants.

15

## CONCLUSION

For the reasons more fully set forth above, moving defendants respectfully request that, after consideration of the foregoing and reconsideration of moving defendants' preliminary pre-trial motions, this Honorable Court issue an Order:

(1) Granting moving defendants' application to dismiss Count 2 of the Indictment; and

(2) Granting moving defendants' application to exclude any and all evidence and/or references to alleged discharges of oily wastes or bilge water occurring outside of U.S. waters; and

(3) For any and all such other and further relief which the Court deems to be just and proper under the specific circumstances of this matter.

Respectfully submitted,

By George M. Chalos
CHALOS, O'CONNOR & DUFFY, LLP
366 Main Street
Port Washington, NY 11050
Tel:  (516) 767 3600
Fax: (516) 767 3605
Email: gmc@codus-law.com

## CERTIFICATE OF SERVICE

I do hereby certify that, on this 6th day of November 2006, I have served a copy of the foregoing pleading on counsel for all parties to this proceeding, by Email and by mailing the same by United States mail, properly addressed, and first-class postage prepaid to the following:

> United States Department of Justice
> U.S. Attorney's Office
> Nemours Building
> 1007 N. Orange Street, Suite 700
> Wilmington, Delaware 19801
> Attn: Edmond Falgowski, Esq.

> United States Department of Justice
> Environmental Crimes Section
> P.O. Box 23985
> L'Enfant Plaza Street
> Washington, D.C. 20026
> Attn: Gregory Linsin, Esq.
>       Jeffrey Phillips, Esq.
>       Tracy Katz, Esq.

Respectfully submitted,

By: George M. Chalos
CHALOS, O'CONNOR & DUFFY, LLP
366 Main Street
Port Washington, NY 11050
Tel: (516) 767 3600
Fax: (516) 767 3605
Email: gmc@codus-law.com

17

# EXHIBIT A

1 of 4 DOCUMENTS

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2006, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** THIS SECTION IS CURRENT THROUGH THE NOVEMBER 2, 2006 ISSUE OF ***
*** THE FEDERAL REGISTER ***

TITLE 33 -- NAVIGATION AND NAVIGABLE WATERS
CHAPTER I -- COAST GUARD, DEPARTMENT OF HOMELAND SECURITY
SUBCHAPTER O -- POLLUTION
PART 151 -- VESSELS CARRYING OIL, NOXIOUS LIQUID SUBSTANCES, GARBAGE, MUNICIPAL OR
COMMERCIAL WASTE, AND BALLAST WATER
SUBPART A -- IMPLEMENTATION OF MARPOL 73/78
OIL POLLUTION

**Go to the CFR Archive Directory**

*33 CFR 151.25*

§ 151.25 Oil Record Book.

(a) Each oil tanker of 150 gross tons and above, ship of 400 gross tons and above other than an oil tanker, and manned fixed or floating drilling rig or other platform shall maintain an Oil Record Book Part I (Machinery Space Operations). An oil tanker of 150 gross tons and above or a non oil tanker that carries 200 cubic meters or more of oil in bulk, shall also maintain an Oil Record Book Part II (Cargo/Ballast Operations).

(b) An Oil Record Book printed by the U.S. Government is available to the masters or operators of all U.S. ships subject to this section, from any Coast Guard Marine Safety Office, Marine Inspection Office, or Captain of the Port Office.

(c) The ownership of the Oil Record Book of all U.S. ships remains with the U.S. Government.

(d) Entries shall be made in the Oil Record Book on each occasion, on a tank to tank basis if appropriate, whenever any of the following machinery space operations take place on any ship to which this section applies --

(1) Ballasting or cleaning of fuel oil tanks;

(2) Discharge of ballast containing an oily mixture or cleaning water from fuel oil tanks;

(3) Disposal of oil residue; and

(4) Discharge overboard or disposal otherwise of bilge water that has accumulated in machinery spaces.

(e) Entries shall be made in the Oil Record Book on each occasion, on a tank to tank basis if appropriate, whenever any of the following cargo/ballast operations take place on any oil tanker to which this section applies --

(1) Loading of oil cargo;

(2) Internal transfer of oil cargo during voyage;

(3) Unloading of oil cargo;

(4) Ballasting of cargo tanks and dedicated clean ballast tanks;

(5) Cleaning of cargo tanks including crude oil washing;

(6) Discharge of ballast except from segregated ballast tanks;

(7) Discharge of water from slop tanks;

(8) Closing of all applicable valves or similar devices after slop tank discharge operations;

(9) Closing of valves necessary for isolation of dedicated clean ballast tanks from cargo and stripping lines after slop tank discharge operations; and

(10) Disposal of oil residue.

(f) Entries shall be made in the Oil Record Book on each occasion, on a tank-to-tank basis if appropriate, whenever any of the following operations take place on a fixed or floating drilling rig or other platform to which this section applies --

(1) Discharge of ballast or cleaning water from fuel oil tanks; and

(2) Discharge overboard of platform machinery space bilge water.

(g) In the event of an emergency, accidental or other exceptional discharge of oil or oily mixture, a statement shall be made in the Oil Record Book of the circumstances of, and the reasons for, the discharge.

(h) Each operation described in paragraphs (d), (e) and (f) of this section shall be fully recorded without delay in the Oil Record Book so that all the entries in the book appropriate to that operation are completed. Each completed operation shall be signed by the person or persons in charge of the operations concerned and each completed page shall be signed by the master or other person having charge of the ship.

(i) The Oil Record Book shall be kept in such a place as to be readily available for inspection at all reasonable times and shall be kept on board the ship.

(j) The master or other person having charge of a ship required to keep an Oil Record Book shall be responsible for the maintenance of such record.

(k) The Oil Record Book for a U.S. ship shall be maintained on board for not less than three years.

(l) This section does not apply to a barge or a fixed or floating drilling rig or other platform that is not equipped to discharge overboard any oil or oily mixture.

(m) This section does not apply to a fixed or floating drilling rig or other platform that is operating in compliance with a valid National Pollutant Discharge Elimination System (NPDES) permit.

(Approved by the Office of Management and Budget under control number 1625-0009)

**HISTORY:** *[48 FR 45709,* Oct. 6, 1983; *48 FR 54977,* Dec. 8, 1983, as amended by *55 FR 18582,* May 2, 1990; *66 FR 55566, 55571,* Nov. 2, 2001; *71 FR 39206, 39209,* July 12, 2006]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE SUBPART:
*33 U.S.C. 1321,* 1903, 1908; *46 U.S.C. 6101;* Pub. L. 104-227 (110 Stat. 3034); E.O. 12777, 3 CFR, 1991 Comp. p. 351; Department of Homeland Security Delegation No. 170.1.

**NOTES:** [EFFECTIVE DATE NOTE: *71 FR 39206, 39209,* July 12, 2006, revised the parenthetical at the end of the section, effective July 12, 2006.]


NOTES APPLICABLE TO ENTIRE CHAPTER:
CROSS REFERENCES: United States Customs Service, Department of the Treasury: 19 CFR Chapter I.
Coast Guard regulations relating to shipping: 46 CFR Chapter I.
Federal Communications Commission: Stations on shipboard in the maritime services: 47 CFR, part 80.
Maritime Administration, Department of Transportation: 46 CFR Chapter II.
Federal Maritime Commission: 46 CFR Chapter IV.
 Other regulations issued by the Department of Transportation appear in Titles 14, I, II, III; 23, I, II, III; 33, I, IV; 44, IV; 46, I, II, III; 48, Chapters 12 and 63, and 49 Subtitle A, I, II, III, IV, V, and VI.

33 CFR 151.25

ABBREVIATIONS: The following abbreviations are used in this chapter:

BMC=Chief Boatswains Mate. CGFR=Coast Guard Federal Register document number. CG=Coast Guard. EM=Electrician's Mate. LS=Lightship. NC=Flag hoist meaning, "I am in distress and require immediate assistance." NCG=Call letters for any Coast Guard Shore Radio Station. OAN=Aids to Navigation Division. PTP=Training and Procurement. U.S.C.G.=United States Coast Guard.

[PUBLISHER'S NOTE: Nomenclature changes affecting Chapter I appear at *70 FR 75731, 75734*, Dec. 21, 2005.]

674 words