IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X

UNITED STATES OF AMERICA

Plaintiff,

Criminal Action No. 06-76 (GMS)

v.

CHIAN SPIRIT MARITIME ENTERPRISES, INC.,
VENETICO MARINE S.A., *et al.*

Defendants.

-------------------------------------------------------X

**DEFENDANTS, CHIAN SPIRIT MARITIME ENTERPRISES, INC. AND VENETICO MARINE, S.A.'s, OBJECTIONS AND REQUEST FOR PRETRIAL RULINGS AS TO THE ADMISSIBILITY OF THE FOLLOWING PORTIONS OF THE RULE 15 DEPOSITION TESTIMONY OF MARIO MANZANILLA.**

**COME NOW,** moving defendants, Venetico Marine, S.A. ("Venetico") and Chian Spirit Maritime Enterprises, Inc. ("CSME")(collectively, "moving defendants"), who respectfully request that this Honorable Court consider and rule, before the voir dire of the jury panel, and out of the presence and hearing of the jury panel, as to the admissibility of the following Rule 15 deposition testimony by Mario Manzanilla, which the Government has stated it will seek to introduce at trial.[1]

Specifically, Moving Defendants object to the admissibility of the following deposition testimony by Mario Manzanilla, an unlicensed "wiper" from the M/V IRENE E., on the following grounds. For the Court's ready reference, a correct and true copy of the transcript of the Rule 15 deposition of Mr. Manzanilla, conducted at the office of the

1 For the Court's ready reference, Moving Defendants advise that in order to facilitate the deposition process, counsel for all parties agreed to expressly reserve making objections during the examination.

United States Attorney, 700 Nemours Building, 1007 Orange Street, Wilmington, Delaware, on Tuesday, July 18, 2006, is attached hereto as Exhibit "A".

**Mario Manzanilla (Wiper)**

As a preliminary matter, Moving Defendants respectfully advise the Court that, during his Rule 15 deposition examination, Mr. Manzanilla clearly, concisely and unambiguously testified that he, personally, ***never*** worked on and/or worked with any licensed marine engineers aboard the M/V IRENE E.M. with respect to use and/or operation of the oily water separator equipment.

In relevant part, and as the Court will note, Mr. Manzanilla testified, *inter alia*, to the following:

*Q Now, I'd like to talk a little bit about what you do on board the ship Mr. Manzanilla. You're not a licensed engineer; right?*
*A No, sir.*
*Q You don't hold a license as an engineer?*
*A No, sir. I'm just an oiler and a wiper.*
*Q Okay. And on board the Irene E.M., you weren't working as an oiler, right?*
*A No, I am a wiper.*
*Q Okay. So when you were on the Irene E.M., you were hired to work as a wiper; right?*
*A Yes, sir.*
*Q And is it fair to say that a wiper is the lowest-ranking member of the engine room team?*
*A Yes, sir.*
*Q Now, let's talk about the oily water separator. The oily water separator is operated by the engineers; right?*
*A Yes, sir.*
*Q You don't operate the oily water separator?*
*A No, sir. I'm only an oiler. Only the oiler[2] uses it.*
*Q Okay. So that the answer is clear, you would agree with me that you don't operate the oily water separator?*
*A No, sir.*
*Q And you don't have any responsibility to maintain the oily water separator, do you?*

---

2 Undersigned counsel respectfully submits that this is a transcription error, as the witness testified, and the transcript should read: *"No sir. I'm only an oiler. Only the engineers use it."*

*A No, sir. Just the main engine is what I'm entail.*
*Q Mr. Manzanilla, yes or no: You don't have any –*
*A No, sir. No, sir.*
*Q Okay. Let me finish my question. Mr. Manzanilla, you would agree with me that you don't have any responsibility to maintain the oily water separator?*
*A No sir.*
*Q So that means you agree with me, yes?*
*A Yes, sir.*
*Q It's also a correct statement that you don't have any responsibility to repair the oily water separator?*
*A Yes, sir.*
*Q You don't make the decision to use the oily water separator if it's being used, do you?*
*A No, sir.*
*Q And you don't make the decision not to use it if the chief engineer decides not to use it; correct?*
*A Yes, sir.*
*Q So all questions Mr. Phillips asked you about the oily water separator, you would agree, were questions about a piece of equipment that you don't have any reason to operate, no reason to maintain, no reason to repair, and no reason to ever use; right?*
*A Yes, sir.*
*Q So everything you know about the oily water separator is based on something someone else told you; right?*
*A Yes sir.*

*See* Exhibit "A," *Transcript at page 30/line 12 through page 33/line 3.*

On cross-examination, Mr. Manzanilla further testified to the following:

*Q Okay. Now, you're not authorized or qualified to report on the condition of the oily water separator . . . are you?*
*A No, sir. Yes, sir. No, sir.*
*Q Okay. So the answer to that would be no, you're not authorized or qualified; right?*
*A Yes, sir.*
*Q You agree with me?*
*A Yes sir?*

*See* Exhibit "A," *Transcript at page 46/lines 1 through 9.*

Additionally, Mr. Manzanilla testified that he never saw the purported "magic pipe" being used on board the M/V IRENE E.M, and that he never saw any oil or oily

wastes actually being discharged into the ocean. Specifically, Mr. Manzanilla testified, in relevant part, to the following during the Government's direct examination:

*Q Did you ever see the magic pipe being used during the voyage from Africa to Brazil?*
*A No sir.*
*Q You never saw it being used?*
*A No sir.*

*See* Exhibit "A," *Transcript at page 13/lines 13 through 17.*

Further in this regard, Mr. Manzanilla testified, during cross-examination, (and in relevant part), to the following:

*Q And now you yourself, in all the time that you were on board the ship, never turned on the pumps to pump anything overboard; right?*
*A No, sir.*
*Q Okay. Now, you yourself never turned off the pumps?*
*A No, sir.*
*Q Now, the whole time you were on board the ship, the captain never asked you to set up a magic pipe; right?*
*A No, sir.*
*Q And the companies, meaning the management company and the owning company, never asked you to set up a magic pipe?*
*A No, sir.*
*Q Okay. And Chief Engineer Dragomir never asked you to set up a magic pipe, right?*
*A No, sir.*
*Q And Second Engineer Villano, you know him, right?*
*A Yes, sir.*
*Q Okay. He never asked you to set up a magic pipe?*
*A No, sir.*
*Q In fact, no one asked you set up the magic pipe between Brazil and the United States.*
*A No, sir.*
*Q And in fact, the truth is, between Brazil and the United States, you never saw anything with your own eyes being discharged overboard?*
*A That's what I remember, that I didn't see anything.*

*See* Exhibit "A," *Transcript at page 37/line 4 through Page 38/line 16.*

In view of the foregoing testimony, Moving Defendants object to the introduction of the following testimony on the basis that it, *inter alia,* lacks foundation; calls for

speculation; and calls for answers which are strictly inadmissible hearsay. Additionally, Moving Defendants object on the grounds that the Government's questions on direct examination are inappropriately leading, assume facts not in evidence and if admitted, would be unfairly prejudicial, confusing and otherwise misleading to the finder of fact:

Page 6/line 23 - Page 7/line 2;
Page 7/line 10 - Page 8/line 9;
Page 12/line 20 - Page 13/line 12;
Page 14/line 5 - Page 17/line 7;
Page 18/line 24 - Page 21/line 4;
Page 42/lines 18-21; and
Page 42/line 23 – Page 43/line 21.

Additionally, Moving Defendants object to the admission of the following testing on the following grounds:

Page 10/line 2 – Page 12/line 8 (hearsay);
Page 33/lines 4 – 21 (hearsay, relevance; lack of foundation; calls for speculation);
Page 42/lines 3-8 (relevance);
Page 43/line 23 – Page 45/5 (foundation; hearsay; calls for speculation; impermissibly goes beyond scope of direct and cross examination);
Page 48/lines 1-13 (relevance and foundation); and
Page 49/lines 6-24 (hearsay; relevance).

## CONCLUSION

For the reasons more fully set forth above, Moving Defendants respectfully request that this Honorable Court issue an Order:

(1) Granting Moving Defendants' application to exclude, either in its entirety or to the extent the Court finds just and proper, the foregoing objectionable

portions of the Rule 15 deposition testimony for the reasons more fully set forth above; and

(2) For any and all such other and further relief which the Court deems to be just and proper under the specific circumstances of this matter.

Respectfully submitted,

By: George M. Chalos
CHALOS, O'CONNOR & DUFFY, LLP
366 Main Street
Port Washington, NY 11050
Tel: (516) 767 3600
Fax: (516) 767 3605
Email: gmc@codus-law.com

## CERTIFICATE OF SERVICE

I do hereby certify that, on this 6th day of November 2006, I have served a copy of the foregoing pleading on counsel for all parties to this proceeding, by Email and by mailing the same by United States mail, properly addressed, and first-class postage prepaid to the following:

United States Department of Justice
U.S. Attorney's Office
Nemours Building
1007 N. Orange Street, Suite 700
Wilmington, Delaware 19801
Attn: Edmond Falgowski, Esq.

United States Department of Justice
Environmental Crimes Section
P.O. Box 23985
L'Enfant Plaza Street
Washington, D.C. 20026
Attn: Gregory Linsin, Esq.
Jeffrey Phillips, Esq.
Tracy Katz, Esq.

Respectfully submitted,

By: George M. Chalos
CHALOS, O'CONNOR & DUFFY, LLP
366 Main Street
Port Washington, NY 11050
Tel: (516) 767 3600
Fax: (516) 767 3605
Email: gmc@codus-law.com

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

\- - -

| | |
|---|---|
| UNITED STATE OF AMERICA, | : |
| | : No. |
| Plaintiff, | : 1:06-CR-00076-GMS-2 |
| | : |
| vs. | : |
| | : |
| CHIAN SPIRIT MARITIME ENTERPRISES, INC., VENETICO MARINE S.A., IRENE E/M, EVANGELOS MADIAS, CHRISTOS PAGONES, ADRIEN DRAGOMIR, | : |
| | : |
| Defendants. | : |

\- - -

Videotaped deposition of MARIO MANZANILLA, taken pursuant to notice before Gail Inghram Verbano, CSR, RMR, in the offices of United States Department of Justice, 700 Nemours Building, 1007 Orange Street, Wilmington, Delaware, on Tuesday, July 18, 2006, beginning at approximately 3:24 p.m.

\- - -

CORBETT & WILCOX
Registered Professional Reporters
1400 French Street Wilmington, DE 19801
(302) 571-0510
www.corbettreporting.com

APPEARANCES:
MARK W. KOTILA, ESQ.
JEFFREY L. PHILLIPS, ESQ.
United States Department of Justice
Environmental Crimes Section
P.O. Box 23985 - L'Enfant Plaza
Washington, DC 20026-3985
Attorneys for Plaintiff
GEORGE M. CHALOS, ESQ.
FOWLER, RODRIGUEZ & CHALOS
366 Main Street
Port Washington, NY 11050
Attorney for Defendants Chian Spirit and Venetico Marine

CARL R. WOODWARD, III, ESQ.
CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI, STEWART & OLSTEIN
5 Becker Farm Road
Roseland, NJ 07068-1739
Attorney for Defendant Dragomir
ALSO PRESENT:
Chris Weiss, Videographer
Chris Masaoay, Tagalog Interpreter

Adrien Dragomir
Liviu-Lee Roth
Brent McKnight
Jason F. Burgess
- - -



THE VIDEOGRAPHER: This is Chris Weiss, the videographer, and the court reporter today is Gail Verbano. We are both here from the firm of Corbett & Wilcox, located at 230 North Market Street, Wilmington, Delaware.

The time is 3:24 p.m. on Tuesday, July 18th, 2006. We are documenting the videotaped deposition of Mario Manzanilla for the plaintiff in the matter of United States of America versus Chian Spirit Maritime Enterprises, Inc., Venetico Marine, Irene E.M., Evangelos Madias, Christos Pagones, Adrien Dragomir in the United States District Court, District of Delaware.

We are at the location of the United States Attorney's office, Nemours Building, 1007 North Orange Street, Suite 700, Wilmington, Delaware.

Will the attorneys please state their appearance for the record.

MR. PHILLIPS: Jeff Phillips, U.S. Government.

MR. KOTILA: United States Government -- I mean Mark Kotila, United States Government.



MR. CHALOS: George Chalos, Venetico Marine and Chian Spirit Maritime Enterprises.

MR. WOODWARD: Carl Woodward on behalf of Adrien Dragomir.

MR. TWERSKY: Michael Twersky on behalf of the witness.

Will the court reporter please administer the oaths.

(CHRIS MASAOAY was previously sworn in as Tagalog-English interpreter.)

- - -

MARIO MANZANILLA, having first been duly sworn through the interpreter according to law, was examined and testified further as follows:

- - -

DIRECT EXAMINATION

BY MR. PHILLIPS:

Q Mr. Manzanilla, thank you for being here today.

Could you tell the court, where are you from, your hometown?

A Bacolod City, Negros, Occidental.

Q And how old are you?



A 35.

Q And what is your occupation?

A Seaman.

Q And where do you normally work?

A In the engine.

Q As a seaman, I assume you work on ships?

A Yes, sir.

Q How many ships have you worked on?

A Eight, sir.

Q Including the last one?

A Yes, sir.

Q And what kind of work do you do in the engine?

A Cleaning the main engine, throwing garbage, assisting for the oilers and the officers.

Q And assisting the oilers and officers, do you ever work on an oily water separator?

A No, sir.

Q Do you know what an oily water separator is?

A Yes, sir.

Q Okay. How do you know what an oily water separator is?

A The previous ships that I have boarded

Page 6

in, I saw them operating it.
Q Okay. And when you say you saw them, describe what you saw.
MR. CHALOS: Objection.
THE WITNESS: Sir, there is a pump, a suction coming from the bilge tank, and the bilge tank going into the overboard.
BY MR. PHILLIPS:
Q Okay. And going from the bilge tank overboard, but you didn't say where the oily water separator was.
A It was in the main engine after Pick.
Q Okay. Now, when were you hired -- or were you ever hired to work on the Irene?
A Yes, sir.
Q Do you remember when?
A November 2004.
Q And where did you board the Irene?
A China, at the port of Lian Yun Gang.
Q And when you boarded the Irene, did you observe if the Irene had an oily water separator?
A Yes, there is. I saw one.
Q Did you observe if it worked?
A When I boarded the ship, the separator

Page 7

was not working, the bilge pump was not in order, and the ship was in critical condition.
Q Where did it go from the port you boarded it? What was the next port?
A Guangzhou port for dry dock.
Q Did you stay with the ship while it was in dry dock?
A Yes. For two months, I was working there.
Q Did you observe the oil/water separator while it was at dry dock?
MR. CHALOS: Objection.
THE WITNESS: The separator was not working, and so we had to use an invincible pump to pump overboard.
BY MR. PHILLIPS:
Q And then what happened after the dry dock?
A We left. We went to Hong Kong. But we were not using that separator at that time. It was not working.
MR. CHALOS: Objection; move to strike.
THE WITNESS: And then --

Page 8

BY MR. PHILLIPS:
Q Go ahead.
A -- the bilge pump -- that's the only one that they had fixed. And then we had a collision in Hong Kong, because we didn't have a radar.
MR. CHALOS: Objection; move to strike the portion of the answer nonresponsive to the question.
BY MR. PHILLIPS:
Q Did you eventually come to port in Africa?
A What do you mean by that?
Q After China, did the Irene go back on the sea?
A We went back again for a dry dock, because there was a hold.
Q And then what?
A So when it went to the dry dock, it got fixed. And then we went into another travel going to Thailand.
Q Did you eventually get to Africa?
A After Thailand, we went to Africa for discharging.
Q What do you mean?

Page 9

A We went to get some loading in Thailand, and so then we went to Africa to discharge.
Q To discharge what you -- what the ship carried?
A Yes. It was rice.
Q Rice. Okay.
And when you were in Africa, do you remember what time that was? Month? year?
A Africa, I don't remember that month.
Q Do you remember the year?
A 2005. 2005.
Q Do you remember where you went from Africa? From Africa, the next port?
A Brazil.
Q Do you remember which month you arrived in Brazil?
A I don't remember. I think January -- no, no, wait.
We came in November -- I think October, like this. October.
Q Okay. On board -- when you were in Africa, who was your chief engineer; do you know?
A Tomondong, the chief engineer before.
Q Before what?

Page 10

A Before the Chief Engineer Dragomir.
Q And did you ever talk to Chief Engineer Tomondong?
A Yes. We worked together for quite some time.
Q Did he ever give you orders?
A Yes. Yes, sir.
Q Do you recall any orders he gave you?
A Yes, sir.
Q Tell us.
A He ordered me to pick out the hard pipe, the original pipes of the bilge pump overboard, the line for overboard; to take out and change the magic pipe.
Q What is the magic pipe?
A Here, sir.
MR. PHILLIPS: For the record, the witness pointed out Government Exhibit 2.
THE WITNESS: The flange.
MR. PHILLIPS: And also the flange, as Government Exhibit 3.
THE WITNESS: (In English) The second engineer who fixed this one --
A The second engineer who fixed this one --

Page 11

THE WITNESS: (In English) And this, also.
THE WITNESS: And this also, this one.
MR. PHILLIPS: And we'll get to that.
MR. TWERSKY: I just want to advise the witness to speak through the interpreter.
THE WITNESS: (In English) Sorry, sorry, sorry.
BY MR. PHILLIPS:
Q And so what did you do?
A He asked me to get the original piece of pipe. He asked me to hide it. And then together with the fourth engineer, the previous one and the oiler, that we should take it out and then change it to this.
Q Why do you call it a magic pipe?
A Because -- because quickly, you can put it out and quickly you can hide it away.
Q When -- did you ever hide it away?
A This particular one, no. But the original one, yes. I was the one that hid it. I was also the one that gave to the Coast Guard the

Page 12

location of where it was hidden.
Q Okay. Who asked you to hide it?
MR. CHALOS: Objection.
BY MR. PHILLIPS:
Q Did anyone ask you to hide it?
A The previous chief engineer, Tomondong.
Q He asked you to hide which pipe?
A The original, the hard pipe.
Q Okay. Now, you eventually came to the United States?
A Yes.
Q When did you know -- did you know you were coming to the United States before you arrived?
A Yes, sir, in Africa.
Q How did you find out?
A Because that was the news from the Superintendent Tanasi and the captain.
Q Superintendent Tomasi?
A Tanasi.
Q Tanasi.
On the trip from Africa to Brazil, after you hooked on the magic pipe, did you -- did you observe the magic pipe during the voyage?
MR. WOODWARD: Sorry. Context?

Page 13

THE WITNESS: Yes, it was fixed.
MR. WOODWARD: Where -- which voyage?
MR. PHILLIPS: This is from Africa to Brazil.
MR. CHALOS: Yeah, but when was it? There was two of those.
MR. PHILLIPS: Two voyages from Africa to Brazil? He didn't say that.
MR. CHALOS: I know, but you're presupposing a predicate.
BY MR. PHILLIPS:
Q Did you ever see the magic pipe being used during the voyage from Africa to Brazil?
A No, sir.
Q You never saw it being used?
A No, sir.
Q Did you ever see the pump working?
A What kind of pump?
Q From Africa to Brazil --
A What kind of, separator or bilge pump?
Q The bilge pump.
A Yes, I saw it.
Q What did you see?

Page 14

A It was working. It was working.
Q What was the bilge pump connected to?
A It's connected to the bilge tank, the bilge pump -- the bilge well and sludge tank.
Q And where would the pumping -- where would the liquid go?
MR. CHALOS: Objection.
THE WITNESS: Outside.
BY MR. PHILLIPS:
Q How would it get outside?
A Because of the use of this magic pipe --
MR. CHALOS: Objection.
THE WITNESS: -- going overboard.
BY MR. PHILLIPS:
Q How many times would you see that?
MR. WOODWARD: Objection; context. Time?
MR. KOTILA: When?
THE WITNESS: About three times I saw it.
BY MR. PHILLIPS:
Q Three times from the trip -- from Africa to Brazil?
MR. WOODWARD: Wait a minute.

Page 15

There's been no foundation for that.
MR. CHALOS: Objection. Objection.
MR. PHILLIPS: That was the original foundation.
MR. CHALOS: The guy said --
MR. WOODWARD: You're going far beyond that.
THE WITNESS: From Africa, yes.
MR. CHALOS: Wait a minute. Hold on a second.
When he testified, you asked if he saw a pump between Africa and Brazil; and then he said that it was working. Then you asked him where it was connected, and then you asked him --
MR. PHILLIPS: No. Then he asked if it was a oil/water separator or if it was a bilge pump.
MR. CHALOS: No, that's not what the testimony has been.
MR. PHILLIPS: That was the testimony.
MR. CHALOS: You led this guy right down the path and based on testimony that we've never had from this witness.

Page 16

MR. PHILLIPS: Okay.
MR. CHALOS: Can we have that read back. Starting with you saw the bilge pump --
(Discussion off the stenograph record with the court reporter
MR. CHALOS: The question and answer said -- you asked him --
MR. PHILLIPS: The question is did he talk about a bilge pump before that question?
MR. CHALOS: You asked him if he saw -- if you saw a magic pipe between Africa and Brazil; and he said no. Then you asked -- him the next question was whether he ever saw the pumps being used.
MR. PHILLIPS: He obviously didn't get the question --
MR. CHALOS: Well, then --
MR. PHILLIPS: -- because then he said he saw it.
MR. CHALOS: Okay. Well, if he didn't get the question, that doesn't mean you can just assume that he made a mistake.
MR. PHILLIPS: Well, he brought it out when his gave his full explanation.

Page 17

MR. CHALOS: I don't think so.
MR. PHILLIPS: So where are we? If you could show me the last thing we worked on.
(Discussion off the stenograph record with the court reporter.)
BY MR. PHILLIPS:
Q Do you remember arriving to the United States?
A Yes, sir.
Q And can you describe what happened when you got to the United States.
A The Coast Guard boarded the vessel.
Q And then what happened?
A And then they checked the engine room. The second engineer, myself and the chief engineer, we checked the pumps and tanks, and that's it.
Q Did you ever talk to the Coast Guard?
A No, no.
Q Did you ever write a statement?
A Yes, sir.
Q And did anybody else come on board?
A The superintendent.
Q Do you remember his name?

A Yes, Christos.
Q And did you ever talk to him?
A Yes, sir.
Q And what did he say?
A He told us that we should retract our statement, because if not, we would go to jail.
Q Who is "us"?
A The engineers that are with me working: The second engineer, the third engineer, the fourth engineer, and the oiler, Robert.
Q And what did you say, if anything?
A We told them -- we told him that we could not change it, because we had already done it, and what is contained there is the truth and so we cannot change it anymore; it's already there.
Q And did you talk to him again?
A When he talked to me again, before New Year's in the mess hall, when we were going down there, he said to us if we tell the truth, that's what we should do so that we don't go to jail.
Q Now, how many months total were you on the Irene?
A From what I remember, about 14 months.
Q During that time, did the oil/water



separator ever work?
MR. CHALOS: Objection.
MR. WOODWARD: Leading.
THE WITNESS: No. You never use it since the very first time.
BY MR. PHILLIPS:
Q So how was oily waste handled on the Irene?
MR. CHALOS: Objection; no foundation.
MR. PHILLIPS: He's already said he's worked in the engine room.
MR. CHALOS: Yeah. What so?
THE WITNESS: They used the bilge pump to pump overboard.
MR. CHALOS: One second. I'm working in the U.S. Attorney's office, but I'm not a government guy. Does that make him qualified?
MR. PHILLIPS: No, but you know what attorneys do.
MR. CHALOS: All right.
BY MR. PHILLIPS:
Q Okay. How often did you observe oil waste being discharged from the Irene?



MR. WOODWARD: During what period of time?
MR. PHILLIPS: During his time on the ship.
MR. WOODWARD: All 14 months?
MR. PHILLIPS: That's right.
MR. WOODWARD: How many times over 14 months?
MR. PHILLIPS: This is the question. I'm asking the question. If you're objecting, you can object.
MR. WOODWARD: I'm objecting to the form of the question. I'm just trying to help you out.
MR. PHILLIPS: No, you're not helping anybody out.
THE INTERPRETER: There was a response there.
MR. WOODWARD: Look, you don't want to put in the time, that's fine.
MR. PHILLIPS: I'm asking about his entire time on the ship.
MR. WOODWARD: Now you did, after you --



MR. PHILLIPS: I already have.
THE WITNESS: From what I remember, many times.
BY MR. PHILLIPS:
Q Let's start again, just so the record is clear.
How many months were you on the ship?
A About 14 months, sir.
Q During that time, how often did you see overboard discharges?
A Since the very beginning, I saw many times. I saw it, they would pump it out since even when Tomondong was there. He was the chief engineer.
Q What about after Tomondong?
A After Tomondong left, I don't exactly remember how many times they did the pump-out.
Q So you don't remember how many times?
A I don't remember exactly, but I believe maybe about three times.
Q Three times in how long?
A That I saw. Since coming from Brazil -- coming from Brazil to America.
MR. PHILLIPS: All right. The

Page 22

defense will have some questions for you.

CROSS-EXAMINATION

BY MR. CHALOS:

Q Hi, Mr. Manzanilla. My name is George Chalos. And I represent Chian Spirit Maritime Enterprises and Venetico Marine in this proceeding.

Now, you know that Venetico Marine is the company that owns the ship; right?

A That I don't know. I only remember Chian Spirit.

Q Okay. So you know that Chian Spirit is the operator or manager of the ship; right?

A Yes, sir.

Q Okay. Let's talk about how you got this job.

You went to a crewing agent in the Philippines; right?

A Yes, sir.

Q And you submitted some paperwork looking for a job; right?

A Yes, sir.

Q And then the crewing agent offered you a job that you could either pick or not pick; right?

A Yes, sir.

Page 23

Q And you picked to go to work on the Irene; right?

A Yes, sir.

Q And when you picked to go on board the Irene, you had to execute an employment contract; right?

A Yes, sir.

Q And when you did that, the job that you were signing up for was to be a wiper; right?

A Yes, sir.

MR. CHALOS: Could we mark a couple documents. Take a break and -- take three minutes to mark some documents.

THE VIDEOGRAPHER: Off the record at 3:52.

(Brief recess.)

(Documents marked CSME Exhibits 29 through 32 for identification.)

THE VIDEOGRAPHER: On the record at 3:57.

BY MR. CHALOS:

Q Mr. Manzanilla, I'm going to show you what we've marked as CSME Defendants' Exhibit No. 29. For the record, I'll make a representation that it's

Page 24

a five-page document. Take a look at that document, would you please, sir.

My first question to you, Mr. Manzanilla, is that the first page and the employment contract you signed to go to work on the Irene E.M.; correct?

A Yes, sir.

Q And then the rest of the documents are also documents that you signed in connection with your application to work on the Irene E.M.; right?

A Yes, sir.

Q And take a look at the second page of that document, if you will. Now, that's a declaration that you signed before you joined the Irene E.M.; correct?

A Yes, sir.

Q And that is your signature on the bottom left-hand side; right?

A Yes, sir.

Q And in fact, before you were allowed to go to work on this ship, you had to go for some training; right?

A Yes, sir.

Q And in fact, you had to go to the office

Page 25

of your manning agent to learn about the company's policies; right?

A Yes, sir.

Q And some of that training involved learning about the company's safety management system; right?

A Yes, sir.

Q And the company's environmental protection policy; right?

A Yes, sir.

Q And you also learned that if you were in violation of the company's policies, you could be fired; right?

A Yes, sir.

MR. CHALOS: Okay. I'd like to move into evidence Defendants' Exhibit 29, which has been identified by the witness.

MR. PHILLIPS: No objection.

(Document marked Exhibit CSME 29 moved into evidence.)

BY MR. CHALOS:

Q I want to show you what we've previously marked and I believe moved into evidence as Exhibit 7, Mr. Manzanilla. And take a look at that

document.
That is, in fact, a copy of the company's environmental protection policy; correct?
A Yes, sir.
Q Okay. Now, Mr. Manzanilla, that was available and posted in several places on board the ship, was it not?
A Yes, sir.
Q That was on the bulletin board in the engine room; right? Right?
A Yes, sir. And in the mess hall.
Q And also in the mess hall; right?
A Yes, sir.
Q And in the hallways; right?
A Yes. Yes, sir. Yes, sir.
Q All right. Now, you also --
MR. CHALOS: Okay. If that's not moved into evidence, I'd like to move that into evidence with this witness.
MR. WOODWARD: That's CSME 30?
MR. CHALOS: CSME 7. We'll come back to this in a second.
BY MR. CHALOS:
Q I'd like to show you what was marked as



Defendants'-- CSME Defendants' Deposition Exhibit 30. For the record, I'll make a representation that it's a two-page document.
Mr. Manzanilla, that document contains a photocopy of the first page of your passport; right?
A Yes.
Q And also the first page of your seaman's book; right?
A Yeah.
Q And that's you on there?
A Yeah.
Q And that is your photograph?
A Yes, sir.
Q With a different hair style?
A Yes, sir. Long hair.
MR. CHALOS: Okay. Now, I'd like to move that into evidence.
MR. PHILLIPS: No objection.
(Document marked CSME Exhibit 30 moved into evidence.)
BY MR. CHALOS:
Q Mr. Manzanilla, I'd like to ask you to take a look at what we've marked CSME Defendants'



Exhibit No. 31. It's an exhibit bearing several pages.
And I just ask you, Mr. Manzanilla, are these photocopies of some of the certificates you received for the training courses you had attended before joining the Irene E.M.?
A Yes, sir.
Q Okay. Now, you also attended classes about MARPOL before you got on board the ship; right?
A Yes, sir.
Q And you knew that it's illegal to discharge oil or oily wastes overboard before you got hired by the company to work on the Irene; right?
A Yes, sir.
Q And you also learned that at the training seminar you went to for the company in the Philippines; right?
A Yes, sir.
MR. CHALOS: Okay. I'd like to move into evidence Exhibit No. 31.
MR. PHILLIPS: No objection.
(Document marked CSME Exhibit 31 moved into evidence.)
BY MR. CHALOS:



Q Okay. Now, Mr. Manzanilla, you've been going to sea for how many years?
A Eight years.
Q And how many ships had you worked on?
A About eight, sir.
Q Okay. So based on your experience, you would agree with me that the company who owned and the company that managed the Irene E.M. were serious companies; right?
MR. PHILLIPS: Objection; vague.
THE WITNESS: Yes, sir.
BY MR. CHALOS:
Q And in fact, before you were even permitted to go on board to start work, the company required you to go for some examinations to make sure that you were both physically and mentally fit to do the job; right?
A Yes, sir.
Q And I'm going to show you what we've premarked as CSME Defendants' Exhibit No. 32, and ask you to take a look at that.
A Yes, sir, these are medicals.
Yes, sir, these are medicals, sir.
Q Okay. So Mr. Manzanilla, these are some

Page 30

of the test results and the reports following your prejoining examinations?
A Yes, sir.
MR. CHALOS: Okay. I'd like to move that into evidence.
MR. PHILLIPS: No objection.
MR. CHALOS: And also ask for our court reporter to fix the exhibit.
(Document marked CSME Exhibit 32 moved into evidence.)
BY MR. CHALOS:
Q Now, I'd like to talk a little bit about what you do on board the ship, Mr. Manzanilla.
You're not a licensed engineer; right?
A No, sir.
Q You don't hold a license as an engineer?
A No, sir. I'm just an oiler and a wiper.
Q Okay. And on board the Irene E.M., you weren't working as an oiler; right?
A No, I'm a wiper.
Q Okay. So when you were on the Irene E.M., you were hired to work as a wiper; right?
A Yes, sir.

Page 31

Q And is it fair to say that a wiper is the lowest-ranking member of the engine room team?
A Yes, sir.
Q Now, let's talk about the oily water separator.
The oily water separator is operated by the engineers; right?
A Yes, sir.
Q You don't operate the oily water separator?
A No, sir. I'm only an oiler. Only the oiler uses it.
Q Okay. So that the answer is clear, you would agree with me that you don't operate the oily water separator?
A No, sir.
Q And you don't have any responsibility to maintain the oily water separator, do you?
A No, sir. Just the main engine is what I'm entail.
Q Mr. Manzanilla, yes or no: You don't have any --
A No, sir. No, sir.
Q Okay. Let me finish my question.

Page 32

Mr. Manzanilla, you would agree with me that you don't have any responsibility to maintain the oily water separator?
A No, sir.
Q So that means you agree with me, yes?
A Yes, sir.
Q It's also a correct statement that you don't have any responsibility to repair the oily water separator?
A Yes, sir.
Q You don't make the decision to use the oily water separator if it's being used, do you?
A No, sir.
Q And you don't make the decision not to use it if the chief engineer decides not to use it; correct?
A Yes, sir.
Q So all questions Mr. Phillips asked you about the oily water separator, you would agree, were questions about a piece of equipment that you don't have any reason to operate, no reason to maintain, no reason to repair, and no reason to ever use; right?
A Yes, sir.
Q So everything you know about the oily

Page 33

water separator is based on something someone else told you; right?
A Yes, sir.
Q Okay. Now, you also said something about radar.
Now, you don't work on the bridge of the ship; right?
A Yes, sir.
Q "Yes, sir," meaning you agree with me, you don't work on the bridge?
A Yes, sir.
Q Yes, sir, you agree with me; or yes, sir, you work on the bridge? I'm not sure I understand.
A I'm not working on the bridge.
Q Okay, Mr. Manzanilla. There's no radars in the engine room, are there?
A No, sir.
Q So anything that you know about the radar or anything you told us about the radar is based on something that someone else told you; right?
A Yes, sir.
Q Okay. Let's talk about Chief Engineer Tomondong.
A Yes, sir.

Page 34

Q Now, you would agree with me that Chief Engineer Tomondong never ordered you to discharge anything overboard?
A No, sir.
Q So when you say "no, sir," you agree that Chief Engineer Tomondong never -- strike that. Let me rephrase my question. I stumbled on my words.
You would agree with me, right, that Chief Engineer Tomondong never ordered you to discharge anything overboard?
A No, sir.
Q When you say "no, sir," are you agreeing with me?
A Yes, sir.
Q Okay. By the way, in addition to the training that you took at the crewing agent and the other training classes that you had, you also went to a maritime school in the Philippines; right?
A Yes, sir.
Q And at that maritime school, you also learned about pollution prevention?
A Yes, sir.
Q All right. Now, you also learned, did you not, that it was illegal to discharge oil or oily

Page 35

wastes overboard; right?
A Yes, sir.
Q And you also learned that if you observed any oil or oily wastes being discharged overboard, that you were supposed to report that to the captain or to the owner of the ship; right?
A Yes, sir.
Q All right. Now, all the stuff you told us about chief -- that happened when Chief Engineer Tomondong was on board, you never reported that to the captain of the ship, did you?
A No, sir. He himself, he didn't report it. He knows that it's wrong.
Q Mr. Manzanilla, I'm asking you what you did. We'll talk to the other guys at another time.
Okay. You personally never reported it to Chian Spirit; right?
A No, sir. I don't know what to do, sir.
Q And just so I'm clear, you also never made a report to Venetico Marine, the owner of the ship, did you?
A No, sir. And I don't know who they are.
Q Okay. Now, let me see if I understand a couple of the things right.

Page 36

You told us before that in the engine room, if you start on the bottom, there's the wipers; right?
A Yes, sir.
Q And then the next promotion would be to oiler?
A Yes, sir.
Q And then the next promotion would be to engineer?
A Yes, sir.
Q And then the boss of the engine room is the chief engineer; right?
A Yes, sir.
Q And the boss of the ship is the captain; right?
A Yes, sir.
Q All right. Now, in all the time that you were on board the ship, you never reported any MARPOL violations to the captain; right?
A No, sir.
Q And now you never reported any MARPOL violations to the chief engineer?
A No, sir.
Q And you never reported any MARPOL

Page 37

violations to either the management company or the company that owns the ship; right?
A No, sir.
Q And now you yourself, in all the time that you were on board the ship, never turned on the pumps to pump anything overboard; right?
A No, sir.
Q Okay. Now, you yourself never turned off the pumps?
A No, sir.
Q Now, the whole time you were on board the ship, the captain never asked you to set up a magic pipe; right?
A No, sir.
Q And the companies, meaning the management company and the owning company, never asked you to set up a magic pipe?
A No, sir.
Q Okay. And Chief Engineer Dragomir never asked you to set up a magic pipe; right?
A No, sir.
Q And Second Engineer Villano, you know him; right?
A Yes, sir.

Page 38

Q Okay. He never asked you to set up a magic pipe?
A No, sir.
Q In fact, no one asked you to set up the magic pipe between Brazil and the United States.
A No, sir.
Q And in fact, the truth is, between Brazil and the United States, you never saw anybody discharging anything overboard, did you?
A Yes, sir.
Q So let me see if I'm clear.
Between Brazil and the United States, you never saw anything with your own eyes being discharged overboard.
A That's what I remember, that I didn't see anything.
Q Okay. Now, in fact, Mr. Manzanilla, just so we're clear, no one has ever asked you to hide anything from the Government or the Coast Guard; right?
A No, sir. No, sir.
Q Not the chief engineer, Mr. Dragomir?
A No, sir.
Q Not the captain of the ship?

Page 39

A No, sir.
Q Not the company?
A The superintendent only.
Q Okay. Now, the superintendent, he didn't ask you to hide anything, did he? What he asked was if you could retract the statement you made; right?
A Yes, that's right, sir.
Q So he didn't ask you to hide anything?
A No, sir.
Q Okay. Now, you also saw a man on board named Mr. Madias; right?
A Yes, sir.
Q Now, Mr. Madias never asked you to hide anything; right?
A No, sir.
Q And he never asked you to lie?
A No, sir.
Q And in fact, the captain never asked you to lie either?
A No, sir.
Q Okay. And Chief Engineer Dragomir never asked you to lie.
A No, sir.
Q And you told us earlier today the

Page 40

companies didn't tell you to lie either; right?
MR. PHILLIPS: Objection; asked and answered.
THE WITNESS: No, sir.
BY MR. CHALOS:
Q Okay. Now, even though you didn't talk to the Coast Guard when they came on board, they asked you to write a statement; right?
A Yes, sir.
Q And you did that?
A Yes, sir.
Q And when you wrote it, it was the truth; right?
A Yes, sir.
Q Okay. And at the time wrote it, this guy Christos wasn't even on board the ship yet; right?
A No, sir, not yet.
Q Okay. Is it fair to say that when the Coast Guard asked you to write a statement, that no one had told you to lie to them?
A No, sir.
Q So you agree with me?
A Yes, sir.
Q Okay. So just so I'm clear about when

Page 41

this discussion took place in the mess room, you had already given your statement to the Coast Guard; right?
A Let me try to remember that.
I believe I had already given it.
Q Okay. And then Mr. Christos asked if you could retract the statement; right?
A Yes.
Q And you said that you couldn't, because you had already told him the truth and given him your statement; right?
A Yes, sir.
Q Okay. And you never lied to the Coast Guard?
A No, sir.
MR. CHALOS: Okay. One second, Mr. Manzanilla.
Okay. Nothing further.
MR. WOODWARD: I have no questions.
REDIRECT EXAMINATION
BY MR. PHILLIPS:
Q Mr. Manzanilla, when you were -- when I was asking you questions, and you said that you had saw three overboard discharges from Brazil to the

Page 42

United States, is that still your testimony?
A That's what I remember, sir.
Q Okay. Now, going back to your employment contract, how much money does a wiper earn on the Irene?
A 230 only, sir.
Q Per year? Per month?
A A month.
Q Now, you testified, in response to Mr. Chalos' questions that this was a serious company. But specifically, were they serious about preventing pollution?
MR. WOODWARD: Objection --
MR. CHALOS: Objection.
MR. WOODWARD: -- speculation.
THE WITNESS: I don't know, sir.
BY MR. PHILLIPS:
Q You testified that the Irene never had an oily water separator that worked?
MR. CHALOS: Objection.
THE WITNESS: Yes, sir.
BY MR. PHILLIPS:
Q Now, you also testified that you were trained on pollution prevention and how to observe

Page 43

oily waste going overboard.
MR. CHALOS: Objection. That wasn't his testimony.
MR. PHILLIPS: That was his testimony -- that was your question.
BY MR. PHILLIPS:
Q Now --
THE COURT REPORTER: What was the answer?
THE INTERPRETER: He hasn't answered.
"Yes, sir." Yes, sir, is the answer.
BY MR. PHILLIPS:
Q Now, can you tell when an oily water separator is working?
MR. CHALOS: Objection.
MR. WOODWARD: No foundation.
THE WITNESS: It was not working. Since I boarded the ship, it had not been working. They just use it as an exhibit.
BY MR. PHILLIPS:
Q Now, when Chief Dragomir came on board, did he change the way oily waste was handled?

Page 44

MR. WOODWARD: Objection; goes beyond the scope of direct.
MR. CHALOS: And cross.
MR. WOODWARD: Introducing an entirely new line of questioning.
BY MR. PHILLIPS:
Q Go ahead and answer.
A I don't remember, sir.
Q So you don't remember if he changed the way --
A That I don't remember, sir.
Q Did they still use the magic pipe when Chief Dragomir was on board?
MR. WOODWARD: Objection, goes beyond direct and cross.
MR. CHALOS: And he testified he doesn't even work there.
THE WITNESS: They were still using it.
MR. PHILLIPS: Okay.
MR. CHALOS: That doesn't come in.
MR. PHILLIPS: For the record, Mr. Chalos asked several questions about all the engineers, the chief engineers, and whether they made

Page 45

orders for overboard discharges. That's what this question relates to.
MR. CHALOS: Anything else?
MR. PHILLIPS: No further from me. Thank you.

RECROSS-EXAMINATION

BY MR. CHALOS:
Q Mr. Manzanilla, you told me that you yourself never saw any overboard discharges, and that's the truth; right?
A Yes, sir.
Q So when Mr. Phillips force-feeds you --
MR. PHILLIPS: Objection. This is --
MR. CHALOS: Okay. I'll rephrase.
THE WITNESS: The only thing that I remember is that this equipment was attached.
BY MR. CHALOS:
Q Okay. So really the answer is that you never saw any overboard discharges between Brazil and the United States with your own eyes?
A I don't really remember exactly, because, you know, this has happened a lot, coming from Africa going to the United States. It was many times.

Q Okay. Now, you're not authorized or qualified to report on the condition of the oily water separator to the company, are you?
A No, sir. Yes, sir. No, sir.
Q Okay. So the answer to that would be no, you're not authorized or qualified; right?
A Yes, sir.
Q You agree with me?
A Yes, sir.
Q Okay. Now, and Mr. Phillips asked you about if you knew how oily wastes were handled on board. Do you remember that?
A Yes, sir.
Q You do know that there were internal transfers from the bilge wells to the bilge holding tank; right?
A Yes, sir.
Q And you also know that the bilge holding tank was really big?
A Yes, sir.
Q In fact, the biggest one you've ever seen on any of the ships you've ever sailed on?
A Yes, sir.
Q More than 106 cubic meters, right, were



the capacity?
A Yes, sir.
Q And that tank never filled up while you were on board, did it?
A We were there in Poland, and -- what kind of tanks are we talking about now?
Q You remember in Poland that oily wastes were discharged to a shore facility; right?
A Because there's a lot of tanks, you know. There's a bilge tank, a sludge tank, a bilge well.
Q So my question is, you remember that oily wastes were put ashore to a shore-side facility in Poland; right?
A In Poland, the sludge tank, yes. But they put it on shore in Poland through a suction.
Q Okay. And that was -- that discharge went from the ship to a shore facility; right?
A Yes, sir.
Q And it didn't go to the sea?
A No, sir.
MR. CHALOS: Okay. Nothing further. Thank you.

RECROSS-EXAMINATION



BY MR. WOODWARD:
Q Between Africa and Brazil, when you were asked the question by Mr. Phillips about magic pipe you said, quote, "they" used it.
A Yes, sir.
Q You don't know who that was, do you?
A The former crew. They've already gone home.
Q Mr. Dragomir never used it, did he?
A In Africa he was just new, so he hadn't made his orders, yet.
MR. WOODWARD: Thank you. No further questions.

FURTHER REDIRECT EXAMINATION

BY MR. PHILLIPS:
Q Mr. Manzanilla, how many times did the Irene discharge oily waste to port?
A Only one time in Poland.
Q That's during your entire time on the ship?
A Yes, only once.
Q Okay.
A Because we were there for a long time. We were there for one month, and then after that, the



sludge tank got filled.
Q Okay. Were Chief Engineer Dragomir and Chief Tomondong on the ship at the same time?
A No, because he joined us in Africa. Our chief engineer in Poland was Tomondong.
Q Who was giving orders from Africa to Brazil?
MR. WOODWARD: I'm going to object to the form of the question.
THE WITNESS: I remember that in Africa it was still Tomondong.
BY MR. CHALOS:
Q In Africa. What about in the ocean from Africa to Brazil?
A I believe it was the second engineer that was making orders then; or maybe it's coming from the chief engineer.
Q Do you know?
A I believe that it was done that way. I'm just not sure.
MR. PHILLIPS: Okay. No further questions.
MR. CHALOS: Nothing further.
MR. WOODWARD: Nothing further.

THE VIDEOGRAPHER: Off the record at 4:30.

(Signature having been waived, the deposition of MARIO MANZANILLA was concluded at 4:30 p.m.)

INDEX


| WITNESS: | PAGE |
|---|---|
| MARIO MANZANILLA | |
| Mr. Phillips | 4 |
| Mr. Chalos | 22 |
| Mr. Phillips | 41 |
| Mr. Manzanilla | 45 |
| Mr. Woodward | 48 |
| Mr. Phillips | 48 |




EXHIBITS

EXHIBITS MARKED FOR IDENTIFICATION

| CSME | DESCRIPTION | PAGE |
|---|---|---|
| 29 | Documents relating to employment of Mr. Manzanilla | 23 |
| 30 | Photocopy of seaman's book and passport of Mr. Manzanilla | 23 |
| 31 | Certificates related to Mr. Manzanilla's training | 23 |
| 32 | Physical and mental test results for Mr. Manzanilla | 23 |

EXHIBITS MOVED INTO EVIDENCE

| CSMR Exhibit No. | PAGE |
|---|---|
| 29 | 25 |
| 30 | 27 |
| 31 | 28 |
| 32 | 30 |



CERTIFICATE OF SHORTHAND REPORTER

I, Gail Inghram Verbano, CSR, RMR, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Gail Inghram Verbano, CSR, RMR
CSR No. 8635
Certification No.: 220
(Expires 1-31-2008)